270 N.J. Super. 472 (1994)
637 A.2d 553
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT-CROSS-RESPONDENT,
v.
ELIZABETH O'LOUGHLIN, DEFENDANT-RESPONDENT-CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1993.
Decided February 15, 1994.
*474 Before Judges PRESSLER, DREIER and KLEINER.
John J. Scaliti, Assistant Prosecutor, argued the cause for plaintiff-appellant-cross-respondent (John J. Fahy, Bergen County Prosecutor, attorney; Robert Hennessey, Executive Assistant Prosecutor, of counsel; Mr. Hennessey and Mr. Scaliti, on the letter brief; Stuart A. Minkowitz, Assistant Prosecutor, and Mr. Scaliti, on the letter reply brief).
Philip DeVencentes argued the cause for the defendant-respondent-cross-appellant (Galantucci & Patuto, attorneys; Mr. DeVencentes, of counsel and on the brief and on the letter reply brief).
The opinion of the court was delivered by KLEINER, J.S.C. (temporarily assigned).
This is a cross-appeal of two decisions of the trial court on defendant Elizabeth O'Loughlin's motion to suppress her oral statement and the seizure of her blood on May 19, 1991. The trial court suppressed the seizure of blood, and the State on leave granted appeals that decision. The trial court denied the motion *475 to suppress defendant's oral statement, and defendant has filed a cross-appeal.[1]
On January 27, 1992, defendant Elizabeth O'Loughlin was indicted by a Bergen County grand jury charging five counts of criminal conduct: count one, aggravated manslaughter, pursuant to N.J.S.A. 2C:11-4(a); count two, reckless manslaughter, pursuant to N.J.S.A. 2C:11-4(b); count three, death by auto, pursuant to N.J.S.A. 2C:11-5; count four, aggravated assault, pursuant to N.J.S.A. 2C:12-1(b)(1); and count five, assault by auto, pursuant to N.J.S.A. 2C:12-1(c).
The indictment relates to a fatal automobile collision on May 19, 1991 at 12:15 a.m. on the upper level of the George Washington Bridge. Defendant was proceeding eastbound toward New York accompanied by a passenger, Charles Greene. She struck the rear of a disabled vehicle which was stopped in the outermost eastbound travel lane. Immediately before the collision, the disabled vehicle's driver, Nakia Wright, age sixteen, was standing at the rear of his vehicle while his passenger, Craig Weinberg, age seventeen, was standing by the right side of the vehicle. The investigators ultimately concluded that the defendant entered the outermost lane and the right front of her vehicle struck the left rear of the disabled automobile. On impact, Wright was pinned between the two automobiles and his vehicle ignited. Weinberg was pushed and became lodged under the defendant's vehicle. Wright was killed and Weinberg was seriously injured. Defendant and her passenger Greene both suffered minor injuries and *476 were transported by ambulance to Harlem Hospital in New York City. Ultimately, as will be discussed, at approximately 5:00 a.m., O'Loughlin gave an oral statement to investigating police officers of the Port Authority Police Department and submitted to a seizure of blood at approximately 5:30 a.m. at Englewood Hospital in Englewood, New Jersey. As indicated, defendant moved to suppress this statement and the blood test. This motion was granted as to the blood test and was denied as to the defendant's statement.
On its appeal, the State contends that the trial court erred in suppressing the seizure of blood.
The cross-appeal of defendant raises the following points of error:
POINT I: THE TRIAL COURT'S RULING SUPPRESSING BLOOD TEST EVIDENCE IN THIS CASE WAS SUPPORTED BY SUFFICIENT CREDIBLE EVIDENCE, AND WAS NOT AN ABUSE OF DISCRETION.
POINT II: THE TRIAL COURT, WHICH FOUND AS A FACT THAT DEFENDANT WAS "DETAINED" FOR SEVERAL HOURS BY THE POLICE WITHOUT PROBABLE CAUSE, ERRED IN FAILING TO SUPPRESS THE EVIDENTIAL USE OF DEFENDANT'S ANSWERS TO POLICE QUESTIONING INSTITUTED WITHOUT MIRANDA WARNINGS AS THE "FRUITS" OF AN ILLEGAL "ARREST".
POINT III: DEFENDANT'S ILLEGAL DETENTION IN NEW YORK AND INVOLUNTARY REMOVAL IN CUSTODY BY POLICE TO NEW JERSEY MANDATES SUPPRESSION OF EVIDENCE SEIZED AS A RESULT OF SUCH ILLEGALITY.
We commence our analysis of these issues by focusing upon the specific ruling of the trial court:
This Court finds that the defendant was detained. There's no question about that, but the Court finds that the defendant's detention constituted nothing more than general on-the-scene questioning, the type that would be allowed during an investigative detention.
We conclude that the detention of the defendant was in fact a custodial detention, and the trial court failed to evaluate properly the evidence presented on the motion to suppress from the perspective of the "objective reasonable person."
In State v. Pierson, 223 N.J. Super. 62, 66-67, 537 A.2d 1340 (App.Div. 1988), we concluded:

*477 Miranda warnings are a prerequisite to custodial interrogation, which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. [436] at 444, 86 S.Ct. [1602] at 1612 [16 L.Ed.2d 694]. [1966] However, Miranda is not implicated when the detention and questioning is part of an investigatory procedure rather than a custodial interrogation, United States v. Booth, 669 F.2d 1231, 1237 (9 Cir.1981); State v. Godfrey, 131 N.J. Super. 168, 175-178 [329 A.2d 75] (App.Div. 1974), aff'd o.b., 67 N.J. 267 [337 A.2d 371] (1975), or where the restriction on a defendant's freedom is not of such significance as to render him "in custody." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); State v. Seefeldt, 51 N.J. 472, 482 [242 A.2d 322] (1968); State v. Downey, 206 N.J. Super. 382, 396-397 [502 A.2d 1171] (App.Div. 1986).
As we indicated in Godfrey, whether a person has been significantly deprived of his freedom so as to trigger Miranda requires a case-by-case approach in which the totality of the attendant circumstances must be examined.
Earlier, in State v. Coburn, 221 N.J. Super. 586, 596, 535 A.2d 531 (App.Div. 1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988), this court acknowledged that in New Jersey we recognize the "objective reasonable man test" in evaluating whether questioning is custodial and concluded that "custody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely." We must therefore look at the totality of the attendant circumstances, State v. Godfrey, supra, 131 N.J. Super. at 177, 329 A.2d 75, in reviewing the facts as they occurred between 12:15 a.m. and approximately 5:00 a.m.
In considering these operative facts, we must carefully evaluate defendant's claims from the perspective of a detainee. We believe our dissenting colleague has avoided the mandate of State v. Coburn, supra, 221 N.J. Super. at 596, 535 A.2d 531, by analyzing the same series of facts solely from the perspective of the Port Authority Police personnel.
As noted, this collision occurred at 12:15 a.m. Both defendant and Greene were transported by ambulance to Harlem Hospital and arrived at 1:00 a.m. At 1:30 a.m., Port Authority police officer Ronald Veale was dispatched to Harlem Hospital with specific instructions to assist on the "aided report" at the hospital and to obtain accident information concerning defendant's name and driver's *478 license number. According to testimony at trial, an "aided report" is:
a supplemental report to a motor vehicle report, accident report which basically lists whether an ambulance was called for an injured party, the name of the doctor that treats the injured party, list the injuries or  and the disposition of the case, whether the person was kept overnight or released. It is just a report as to a person's medical condition after an accident.
On arrival at Harlem Hospital, Veale discovered O'Loughlin, Greene, and an unknown female (later identified as Sandi Gaspari) engaged in an "animated" conversation with hospital personnel near the doorway to the emergency room. From the demeanor of the group and the tenor of the conversation, Veale was able to conclude that Greene was intoxicated and that O'Loughlin desired to leave Harlem Hospital to obtain medical treatment at another hospital. Defendant was apparently upset that she had been kept waiting and had not yet received any medical attention from the Harlem Hospital employees. Veale informed defendant that inasmuch as Greene was intoxicated, she could not leave with him, but that an ambulance would be summoned to provide defendant with transportation. Veale observed O'Loughlin's injuries were minor lacerations.
Veale testified that when the ambulance failed to arrive, defendant, Greene, and Gaspari left the hospital in Gaspari's vehicle. Veale claimed that he followed Gaspari's vehicle in a patrol car as it proceeded to circle the block. When it arrived back at the emergency room entrance, the three occupants exited the vehicle and reentered the hospital. Veale offered no explanation as to why he followed Gaspari's vehicle or whether he had inquired as to the reason why the trio returned to Harlem Hospital. He concluded his direct testimony by indicating that he was relieved at 3:00 a.m. by Port Authority police officer William Curran. Veale offered no testimony respecting the demeanor of the defendant.
On cross-examination, Veale admitted, "I wouldn't let her leave when she I thought [sic] Mr. Green was going to drive her. That's the only time I wouldn't let her leave." However, Veale also acknowledged that in his written report he wrote, "I informed *479 them that they had to wait, an ambulance was on the way to transport them." Cross-examination also established that Veale never prepared an "aided report," and never asked any questions concerning the defendant's name or driver's license number as per his original instructions.
Veale's rendition of the events between his arrival at approximately 2:00 a.m. and 3:00 a.m., when he was relieved by Officer Curran, was substantially contradicted by Sandi Gaspari. Gaspari indicated she was summoned by a telephone call from passenger Greene while at her home and was requested to provide transportation assistance. On arrival at Harlem Hospital, she found O'Loughlin, Greene, and a police officer engaged in a conversation at the hospital entrance. Her actual testimony is noteworthy:
Q And what happened when you got there, what did you do?
A I started talking to Elizabeth and asked her what happened and said, "Are you ready to go?" She went to leave and the cop would not let her leave.
Q What do you mean? Just tell us what was said and what happened?
A There was a lot of arguing why can't she leave, she has to stay here, this was a big accident.
Q Who said that?
A The police officer.
Q Go on.
A Well, is she under arrest? No, she is not. Well, then she's leaving with me. No, she can't. I said, "Well, you know, she's not under arrest, she can leave with me. Come on, Elizabeth," and when we started walking, "You'll be under arrest, all three of you. She cannot leave. She is under our care."
Gaspari also contradicted Officer Veale when she testified that she left Harlem Hospital alone and drove around the block to pick up defendant and Greene at the hospital exit. On finding that defendant and Greene were not at the exit, she reentered the hospital and discovered O'Loughlin and Veale engaged in a conversation during which Veale indicated to defendant that she could either travel to Englewood Hospital with Veale or be escorted there by another police officer, but O'Loughlin could not leave with Gaspari.
Officer Curran testified that after his arrival at Harlem Hospital at 3:00 a.m., when he relieved Veale, he attempted without success *480 to locate a taxicab to transport defendant to Englewood Hospital. When a taxi could not be found in the hospital area, Curran offered to drive the trio to a taxi stand near the George Washington Bridge. He indicated that O'Loughlin suggested that the trio leave in Gaspari's vehicle and that he informed defendant that Greene would be arrested if Greene drove Gaspari's vehicle due to his apparent intoxication.
When Gaspari offered to drive, Curran asked to inspect Gaspari's driver's license. After looking at the license, he advised O'Loughlin either to stay at Harlem Hospital or to travel with him in his police vehicle to a taxi stand. Curran's responses to the prosecutor's questioning are significant:
Q What happens now?
A I told  I asked her to get in the police car. .. . Miss O'Loughlin wanted to go with her friends and then I pleaded with her to get into the car.
........
Q Now, does there come a point in time where she asked you whether or not she's under arrest?
A Yes, she did.
Q And please tell the Court how that transpired?
A [S]he yelled at me two or three times, "Am I under arrest?"
Q And what was your reply?
A I said no, just please leave me alone, basically get in the car, we'll get you a cab.
Before defendant entered the police vehicle, Curran insisted on inspecting her purse. He explained that when she resisted, "I told her  I asked her to give it to her friend, she said no. And then I told her if she didn't give them the pocket book, I wouldn't let her in the police car." O'Loughlin then left her purse with Gaspari and entered the police vehicle.
We note that Veale testified that although he had been relieved by Curran at 3:00 a.m., he followed Curran's police vehicle from the hospital to the taxi stand, a standard police procedure whenever an officer transports an unaccompanied female.
Upon arrival at the cab stand, Curran radioed Port Authority headquarters and arranged for a dispatch of a taxi from a company *481 located in New Jersey, "Babe's Cab," to travel across the George Washington Bridge to provide transportation. The taxicab operator testified for the defense. He indicated that he was instructed to drive O'Loughlin to Englewood Hospital, that his fare would be paid by the Port Authority, and upon leaving, he was told, "Don't lose her."[2] His travel log contained the name of Curran's supervisor, Lieutenant Whittaker, as the person to contact for payment. Curran denied giving any instructions to the taxi driver. He indicated that twenty seconds after the taxi driver departed, he was instructed by Lieutenant Whittaker by radio dispatch to follow the taxi to Englewood Hospital to "determine her condition and do an aided report." Curran then drove to Englewood Hospital and remained there for approximately twenty minutes until Port Authority officers Weckerle and Bull arrived. Curran thereafter left without completing any "aided report."
Weckerle was the principal officer in charge of this investigation. He initially arrived at the accident site at 1:45 a.m., after O'Loughlin had been transported to the hospital. An inspection of the O'Loughlin vehicle revealed two empty party cups, one of which smelled of alcohol, and two crushed beer cans in the vehicle. Weckerle determined that the crash was a result of a rear-end collision in the outermost lane of travel. On arrival at the bridge, he found that of the string of highway lights along the back span of the bridge, only one street light near the crash site was operating.
*482 At approximately 4:10 a.m., Weckerle, accompanied by Officer Bull, left the George Washington Bridge and returned to headquarters. They intended to then travel from headquarters to St. Luke's Hospital in Manhattan to interview Craig Weinberg to learn the identity of the male decedent whose body and clothing lacked any identification. By police radio transmission, Weckerle learned that O'Loughlin had been transported to Englewood Hospital. He decided to alter his plan and to interview O'Loughlin before his intended interview with Weinberg. Weckerle and Bull arrived at Englewood Hospital at 4:45 a.m. He indicated he found defendant seated on a gurney and alone. However, Gaspari indicated in her testimony that she was seated with O'Loughlin when Weckerle and Bull arrived and they requested that she leave so that O'Loughlin could be interviewed.
On direct examination, Weckerle testified:
Q Now, you go in with Officer Bull, tell the Court what did you do?
A Well, after I identify myself, I asked her if she was the driver of the vehicle, the Jeep and she said she was and I asked her if she could tell me, recount to me what happened prior to  that led up to the collision.
Q And what, in fact, did she inform you?
A She told me that she was traveling in bridge lane 8, she was talking to her passenger Charlie Green [sic] and wasn't paying attention.
........
She looked up, she saw the vehicle and she told me that she didn't see any lights on it or no flares behind it, hit her breaks [sic] and struck the vehicle.
Q And did she tell you anything else?
A She said that the next thing she was aware of was she got out of the vehicle, she said that, as did her passenger, and they heard someone yelling for help and she was aware of a voice coming from underneath her vehicle, the Jeep, of Craig Weinberg.
........
Q So what, if anything, did she tell you after that?
A [A]nd so then along with her telling us how the collision occurred, I also asked her as a matter of course what she had remembered doing the day before. Because, we like to do a time on the operators of motor vehicles involved in accidents, and she told us she got a full night sleep the night before and she up at 8 o'clock in the morning to stand on line for Grateful Dead tickets, she took a nap *483 between 12 and 1 in the afternoon, this all being on the 19th, she went to a backyard barbaque [sic] about 6 p.m.
Q Where was the barbaque [sic]? Did she tell you?
A At that time, I believe, she told us it was in Dumont.
Q And approximately 6 p.m.?
A Yes.
Q And it would have been on May 18, 1991?
A The 18th.
Q Please continue. Did she tell you anything else?
A She informed myself that she had consumed four cups of beer.
Q Now, when you arrived at the hospital to speak to her, was she a target of any investigation of yours?
A No.
Q When you were at the hospital, was she under arrest?
A No. She was not.
Q Did you ever place her under arrest on that morning at all?
A No.
Q However long did the conversation take place with the defendant, if you recall?
A Ten or fifteen minutes.
........
Q Officer, what led up to the defendant's blood being drawn?
A Well, remembering that we had two cups of  two wet cups that were inside the Jeep back at the accident scene that did very the smell [sic] of alcoholic beverage and then I was standing talking to Miss O'Loughlin next to the gurney to her right and Officer Bull was standing behind me by her feet and I didn't detect any odor of alcoholic beverage coming from her and I didn't see anything unusual about her demeanor, so I explained to her, I said, "As I understand Title tell [sic] 39, that when you're involved in a fatal accident, they suspend your license for six months administratively and you're entitled to a hearing with your own attorney and to get that, to get that suspension lifted if you can prove that you weren't at fault," and I said, "We'd like to have blood from you." I said, "If it comes back negative, you have Officer Bull and I to testify along with the negative reading on the blood to show that you weren't at fault in this accident, at least," you know, so with that explanation she voluntarily gave us blood.
........
Q Now, approximately what time did you leave the hospital, if you recall?
A Blood was drawn at 5:24, we interviewed Mr. Green [sic], either approximately  we left probably before six.
........

*484 Q When was a complaint signed against Elizabeth O'Loughlin?
A I believe the 24th of May.
As noted, from shortly after 2:00 a.m. when Veale arrived at Harlem Hospital, until 4:45 a.m. when Weckerle and Bull arrived at Englewood Hospital, defendant was under continuous police supervision. Ostensibly this supervision was performed to enable the police to complete an "aided report" and to assure that O'Loughlin received medical treatment. An "aided report" was never prepared, and defendant was never asked any questions respecting her identity or her licensure.[3] Although the police expressed concern for O'Loughlin's medical condition, no such concern or beneficence was displayed in any manner toward passenger Greene, who was intoxicated and suffering from superficial but observable lacerations but who was permitted to leave the hospital untreated and in the company of Gaspari.
Was O'Loughlin actually free to leave Harlem Hospital after the arrival of Officer Veale? At any time after Officer Veale arrived did O'Loughlin perceive she was free to leave Harlem Hospital or Englewood Hospital? Clearly not. Although she was not charged with a crime or a motor vehicle offense, nor handcuffed or otherwise physically restrained, which are some indicia of formal custody, State v. Godfrey, supra, 131 N.J. Super. at 175, 329 A.2d 75, she was told that she was under the "care" of the police, and that she could not leave with Gaspari and would be required to "wait" at the hospital for police-arranged transportation. Moreover, according to Gaspari, defendant heard Veale indicate that the trio would be arrested if they left Harlem Hospital. The presence of the police and the conduct of Officer Veale caused Gaspari to inquire, in defendant's presence, whether O'Loughlin was under arrest and caused defendant herself to ask Officer Curran whether she was under arrest.
When defendant indicated she would travel to Englewood Hospital with Gaspari, the police inspected Gaspari's driver's *485 license, and then informed defendant that she would be transported by the police. En route to the taxi stand by police vehicle, she was compelled to sit in the rear of the vehicle and was prohibited from taking her purse with her unless she was willing to have that article searched. We may appreciate the salutary purpose of requesting a single woman to sit separate and apart from the transporting police officer and to require an inspection of her purse before entry into the vehicle. Nevertheless, the test of "custody" is not the conclusion reached after an objective judicial analysis but the objective conclusion of the reasonable person. State v. Coburn, supra, 221 N.J. Super. at 596, 535 A.2d 531.
Finally, not only was O'Loughlin accompanied from Harlem Hospital to the taxi stand, but the cab driver was instructed not to lose her, and on arrival at Englewood Hospital, the very officer that transported her to the taxi stand arrived to continue the monitoring.
We conclude that a reasonable person under these circumstances would perceive that she was not free to leave. From the first contact with Officer Veale, it is clear and uncontradicted that O'Loughlin appeared sober and coherent, that she had sustained only superficial lacerations to her knees and face, and that she had arranged for private transportation with a licensed driver. Yet when she attempted to leave Harlem Hospital, she was not permitted to do so.
The trial court reasoned that the questions asked were the same questions which would be permitted in the detention of a motorist at an accident scene. We note that although the questions asked may be similar to an accident scene interrogation, the atmosphere of the questioning is substantially divergent from the temporary post-traffic accident detention which has been deemed constitutionally permissible.
In declaring that a routine traffic stop is not a "custodial interrogation," Berkemer v. McCarty, 468 U.S. 420, 437, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317, 333 (1984), stressed that the detention of a motorist is "presumptively temporary and brief" and that the *486 public nature of the routine traffic stop allows others to witness the interaction of the police and a motorist, thus making the questioning less intimidating.
In this instance, however, the presence of a police officer was far from "brief" and the questioning occurred in private in a non-public hospital examining room. Compare State v. Toro, 229 N.J. Super. 215, 221-22, 551 A.2d 170 (App.Div. 1988), certif. denied, 118 N.J. 216, 570 A.2d 973 (1989), overruled on other grounds by State v. Velez, 119 N.J. 185, 574 A.2d 445 (1990).
The facts here are unlike State v. Zucconi, 50 N.J. 361, 235 A.2d 193 (1967), relied upon by the State. Zucconi involved a fatal automobile accident. The driver, who was continuously hospitalized, was questioned in the hospital two weeks after the collision. The hospital setting was deemed to be in "surroundings totally lacking the `compelling atmosphere inherent in the process of incustody interrogation.'" Id. at 364, 235 A.2d 193 (quoting Miranda, supra, 384 U.S. at 478, 86 S.Ct. at 1620, 16 L.Ed.2d at 726). The Zucconi interrogation was substantially different from the circumstances of the questioning here.
Based on all of the foregoing, we conclude that O'Loughlin was questioned while in custody. She was entitled to Miranda warnings, and her oral statements under these circumstances should have been suppressed.
We reject the dissenting view of our colleague that this was not a custodial interrogation due to the performance by the police of a "community caretaking function," Cady v. Dombroski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714-15 (1973). The concept of "community caretaking function" as discussed in Cady arose in an analysis under the Fourth Amendment. Substantially incriminating evidence was found in defendant's disabled motor vehicle after the vehicle had been towed from a highway accident scene to a garage. The vehicle had been entered for the sole purpose of locating defendant's police service revolver. Defendant was an off-duty police officer who was not wearing his *487 revolver when he was injured in a one-car automobile accident and who, after his hospitalization, lapsed into a coma. The entry into his motor vehicle was deemed to be the performance of a legitimate police function, as community caretaker, to retrieve and secure the revolver.
The specific question raised in Cady was:
Here we must decide whether a "search" of the trunk of the 1967 Ford was unreasonable solely because the local officer had not previously obtained a warrant. And, if that be answered in the negative, we must then determine whether the warrantless search was unreasonable within the meaning of the Fourth and Fourteenth Amendments.
[Id. at 442, 93 S.Ct. at 2528-29, 37 L.Ed.2d at 715.]
The "community caretaking function" exception recognizes that police may, dependent upon the factual circumstances, be required to enter a disabled or abandoned motor vehicle without a search warrant and without probable cause.
Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.
[Id. at 441, 93 S.Ct. at 2528, 37 L.Ed.2d at 714-15.]
The most extreme example of the utilization of this concept is articulated in State v. Goetaski, 209 N.J. Super. 362, 365-66, 507 A.2d 751 (App.Div.), certif. denied, 104 N.J. 458, 517 A.2d 443 (1986), where the police stopped a motor vehicle observed at 4:00 a.m. traveling on the shoulder of a rural road with its left turn signal in a blinking mode of operation. This unusual occurrence justified the police stop to investigate whether the automobile operator was in need of assistance. The court sustained a motor vehicle charge issued pursuant to N.J.S.A. 39:4-50 after the vehicle was stopped, but with this proviso: "[W]e do not hesitate to add that this stop is about as close to the constitutional line as we can condone." Id. at 366, 507 A.2d 751.
Our dissenting colleague has, in our opinion, overextended the "community caretaking function," an exception to the Fourth Amendment, to justify and validate the actions of the Port Authority *488 Police personnel who assumed an improper watchful stance over defendant O'Loughlin under the guise of guaranteeing that she would obtain medical treatment, not because of their interest in her welfare, but to avoid any potential governmental liability which might be alleged by O'Loughlin in the event she did not secure medical treatment or should she befall some other injury en route to obtaining treatment at a different medical facility.
We do not imply that the police, while investigating an accident, have no responsibility to injured drivers and passengers at an accident scene. The police clearly have a responsibility; however, that responsibility is completely fulfilled when the police successfully arrange for transportation of the injured to an appropriate medical facility by ambulance or rescue squad personnel. Once this is accomplished, the duty of the investigating police as it pertains to the administration of medical treatment ends. The necessity of recording information such as to the nature of an injury is easily accomplished at a later time. The State has failed to offer any legitimate justification as to an asserted need to gather medical information simultaneously with the administration of the medical attention by a hospital to an injured accident victim.[4]
*489 The trial court suppressed the seizure of defendant's blood based upon its conclusion that the State lacked probable cause for the warrantless involuntary seizure of blood. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The trial court gleaned from Schmerber four requirements which it concluded are a combined requisite to validating an involuntary seizure of blood: (1) probable cause to believe that evidence of a crime will be revealed by the search; (2) probable cause to arrest coupled with arrest either before or substantially contemporaneous to the search;[5] (3) articulable and demonstrative exigent circumstances which would justify dispensing with the requirement of the issuance of a warrant for the seizure; and (4) the taking of a blood sample in a medically reasonable manner.[6]
The investigating police officer knew when he arrived at Englewood Hospital that a death had occurred after a rear-end automobile collision and that the decedent had been standing at the rear of his disabled vehicle. He also had observed two empty party cups, one of which was moist and smelled of alcohol, and had also observed two crushed beer cans in the defendant's vehicle. The defendant's admission that she had consumed four cups of beer at *490 6:00 p.m. at a barbecue, when coupled with the physical evidence at the scene of the collision, in our opinion, would have given the officer probable cause to request a warrant for the involuntary seizure of blood. The trial court correctly concluded that the existence of probable cause would under the exigent circumstances at that late stage of the investigation have been sufficient to dispense with the necessity of obtaining a warrant for the seizure. Schmerber, supra, 384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920; State v. Dyal, supra, 97 N.J. at 239-40, 478 A.2d 390. Based upon this analysis, we conclude that the argument offered by the State on its motion would ordinarily have succeeded.
However, having concluded that the oral statement of defendant was violative of her common law privilege against self-incrimination, State v. Hartley, 103 N.J. 252, 271-77, 281-85, 511 A.2d 80 (1986); see also State v. Hall, 253 N.J. Super. 84, 92, 600 A.2d 1248 (Law Div.), aff'd o.b., 253 N.J. Super. 32, 600 A.2d 1221 (App.Div. 1991), the defendant's statement at Englewood Hospital must be excluded in our analysis. As a result, the investigating officer's knowledge is limited to the facts that he observed at the accident scene and his observations of the defendant upon his arrival at the hospital. It is undisputed that O'Loughlin demonstrated no evidence of any physical manifestation of having consumed any alcoholic beverage when observed by Officer Weckerle.
In the absence of probable cause to believe that a crime or an alcohol-related motor vehicle offense had been committed, the seizure of defendant's blood clearly violated her Fourth Amendment rights. Schmerber, supra, 384 U.S. at 767, 86 S.Ct. at 1834, 16 L.Ed.2d at 917-18.
A search warrant based on illegally obtained information is itself tainted and all evidence seized pursuant to it must be suppressed. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); State v. Parisi, 181 N.J. Super. 117, 119, 436 A.2d 948 (App.Div. 1981). Although exigent circumstances may dispense with the necessity of obtaining a search warrant, the warrantless search must be predicated upon a finding of probable *491 cause which does not depend upon tainted evidence. C.f. State v. Ortense, 174 N.J. Super. 453, 454-55, 416 A.2d 971 (App.Div. 1980).
The decision of the trial court admitting the oral statement of the defendant is reversed. The suppression of the seized blood sample is affirmed.[7]
DREIER, J.A.D. (Dissenting).
The majority has accepted defendant's arguments concerning the admissibility of (1) the statement she made concerning her ingestion of alcohol prior to the accident and (2) the results of her ensuing blood-alcohol test. My colleagues conclude that there was a custodial interrogation and an impermissible seizure of the blood. I see only a concern for defendant's physical well-being, a desire on the part of the Port Authority personnel to forestall any claim of civil liability, and an attempt to conclude an accident report and exonerate defendant.
Following the accident, defendant was not detained as a suspect on a charge of death by auto, N.J.S.A. 2C:11-5, or driving while intoxicated, N.J.S.A. 39:4-50. However, different members of the Port Authority Police were in contact with her throughout the night and early morning. Officer Veale was dispatched to Harlem Hospital an hour and a quarter after the accident to assist on an "aided report." His duties were not investigative with a view to charging defendant or anyone else with any offense, but rather of a community caretaking nature. See Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714-715 (1973).[1] Defendant had asked for medical assistance and had been taken to *492 Harlem Hospital by ambulance. When she saw the conditions at Harlem Hospital, she stated that she did not want to be treated there, but rather wanted to be taken to Englewood Hospital in New Jersey. While a friend, Ms. Gaspari, was available to transport defendant, Officer Veale, mistakenly or not, determined that it would not be in defendant's best interests (or perhaps the Port Authority's best interest in the event of an eventual civil proceeding), to have defendant leave Harlem Hospital in a private vehicle, presumably because the Port Authority would be unsure that defendant actually would receive the medical attention she thought she should receive.[2]
Officer Veale's intention was to have defendant transported to Englewood Hospital by an ambulance. She was not placed in custody any more than any other accident victim awaiting medical attention is placed in custody while being aided by the police. When no ambulance was available, and Officer Veale had been relieved by Officer Curran at 3:00 a.m., the new officer determined that defendant could be transported to Englewood Hospital by taxicab. They could have walked to a taxi stand, but considering defendant's possible physical problems resulting from the accident, and the dangers of the neighborhood, this was obviously unwise. Therefore Officer Curran drove defendant to the taxi stand. The fact that the mode of transportation was a police car did not mean that defendant was in custody. Officer Curran specifically noted that he had not activated the automatic locks, and that when they stopped, defendant was free to, and did, exit the vehicle to walk around. The fact that the officer requested that he be permitted to examine her purse or, in the alternative, that she give the purse to her friend was a reasonable precaution, obviously taken for his own safety.
*493 It would have been easy for Officer Curran himself to have driven defendant to Englewood Hospital. But to assuage any ill feelings that may have developed between defendant and the police after arguments with defendant's friend, Ms. Gaspari, and more heated exchanges with defendant's companion who was obviously intoxicated, Officer Curran, at the Port Authority's expense, placed defendant in a taxicab bound for Englewood Hospital.[3] My colleagues somehow attribute something nefarious to the statement made to the cab driver that he should not lose his passenger on the way to the hospital. I see this comment as an expression of concern and a desire to have the passenger reach her stated destination.
Soon after the taxi left, Officer Curran's supervisor told him to do what his predecessor, Officer Veale, had originally been ordered to do, namely, to conclude an "aided report." This report apparently would have ended with defendant being treated at Englewood Hospital. Officer Curran therefore proceeded to Englewood Hospital. Although the taxi and the police car went from the same starting point to the same destination, I see no indication that Officer Curran had been directed to follow defendant because she was in custody. The taxi driver may have been an agent of the police for the purpose of delivering defendant to the hospital, but he did not have defendant "in custody." At the hospital, Officer Curran waited to see that defendant was placed on a gurney and was under the care of the hospital. He left when the other officers, Weckerle and Bull, arrived. He never completed his "aided report" that day.[4]
I fail to see that up to this point in the factual sequence the Port Authority Police, whether efficiently or ineptly, did any more than *494 discharge its community caretaking function of seeing defendant reach the hospital of her choice to receive any medical care that she might need. Defendant to that point had not been the subject of any investigation, nor had she been placed in custody.
Officers Weckerle and Bull performed a different function than Officers Veale and Curran. They had been investigating the accident since it occurred. They had remained at the George Washington Bridge until 4:10 a.m. They planned for their next stop to be St. Luke's Hospital in Manhattan to interview the surviving victim, when they heard by radio that defendant had been transported to Englewood Hospital. Since the accident victim apparently would remain at St. Luke's Hospital for some time, they chose first to interview defendant, and reached Englewood Hospital at 4:45 a.m.
The officers remembered that when they arrived defendant was alone, sitting on a gurney. Defendant's friend, Ms. Gaspari, remembered that she was there, but that she was asked to leave when the officers arrived to interview defendant. She was not in a custodial setting. Rather, she was in the Englewood Hospital emergency room, where she had requested to be taken. The setting was neutral, defendant had not been arrested, and according to the officers she appeared perfectly coherent and not under the influence of alcohol.
By way of investigation of the cause of the accident, and not concerning any DWI or death by auto charge, Officer Weckerle asked defendant how the accident occurred. Since obviously the defendant had not seen the stopped vehicle, the state of her attention and acuity was relevant to the happening of the accident. She therefore was asked what she had done the day before the accident. She mentioned that she had gone to a barbecue at 6:00 p.m. and that she had consumed four cups of beer. Even if the barbecue had extended for a period of two hours, she would have finished her last beer four and a quarter hours prior to the accident. The officers testified specifically that she was not the target of any investigation, nor was she in custody when this *495 statement was made. I therefore disagree with my colleagues that this statement concerning the four beers was made during a custodial interrogation and required the administration of Miranda warnings.
The officers then explained why they were requesting a blood sample. They told her that under the Motor Vehicle Act when one is involved in a fatal accident there is a six-month administrative suspension of the driver's license, but that the driver is entitled to a hearing to have the suspension lifted if the driver can prove that she or he was not at fault. Officer Weckerle told her that they therefore would like to have a blood test and "if it comes back negative, you have Officer Bull and I to testify along with the negative reading on the blood to show you weren't at fault in this accident, at least." Officer Weckerle testified that he did not think defendant was intoxicated, but that because there had been cups found in the car (at least one of which had smelled of alcohol) this blood test was taken, not to inculpate defendant, but to exculpate her. It was to remove any lingering doubt that may have existed in any later administrative proceeding that not just defendant's intoxicated companion, but also defendant may have been drinking.
N.J.S.A. 39:5-30e(4) is the statute that was roughly described by Officer Weckerle. It provides:
Whenever a matter is presented to the director involving an alleged violation of
(1) R.S. 39:4-98, where an excess of 20 miles per hour over the authorized speed limit is alleged, and which has resulted in the death ... of another;
(2) R.S. 39:4-50, which has resulted in the death . .. of another;
(3) R.S. 39:4-96 or R.S. 39:4-97, which has resulted in the death ... of another; or
(4) R.S. 39:4-129, wherein the death ... of another has occurred, the director for good cause may, without hearing, immediately issue a preliminary suspension of any license certificate ... held by an individual charged.... Along with a notice of preliminary suspension, the director shall issue a notice of proposed final suspension, revocation or other final agency action, and shall afford the individual the right to a preliminary hearing to contest the preliminary suspension and a plenary hearing to contest the proposed final agency action.
....
At the preliminary hearing, the parties shall proceed on the papers submitted to the [administrative law] judge, including the summons, the police report and the *496 charged individual's prior driving record submitted by the division, and any brief affidavits permitted by the judge from persons who shall be witnesses at the final hearing, and the parties may present oral arguments. Based on the papers, on any oral argument, on the individual's prior driving record, and on the circumstances of the alleged violation presented in the papers, the judge shall immediately determine whether the individual was properly charged with a violation of the law and a death occurred; and, if so, whether in the interest of public safety, the preliminary suspension shall be continued pending the final agency decision on the matter. The administrative law judge shall transmit his findings to the director.
Given the possible suspension, the police thus had to indicate whether the accident that caused the death had been a result of (1) excessive speed at least twenty miles per hour over the speed limit, (2) driving while intoxicated, (3) careless or reckless driving, or (4) failure to follow correct procedures after an accident. I assume that the police investigation at the George Washington Bridge had been directed to speed and careless or reckless driving.[5] Since defendant had not left the scene of the accident, N.J.S.A. 39:4-129 was inapplicable. Thus the police in their report wished to foreclose the last possibility, that of any alcohol involvement.
If in a non-custodial setting general questioning of a driver who is not suspected of being intoxicated to exculpate the driver who has been involved in a fatal accident in order to save her driver's license requires the Miranda warnings, then Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), has greater application than I am willing to accord it. If the majority is correct here, all investigative questioning, even where the police have not settled on the subject as a suspect would meet the same roadblock. For example, a non-suspect could not be asked during an investigation for corroboration of an alibi.
Requesting a voluntary blood sample under the circumstances just mentioned also does not in my opinion even approach a violation of Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The recitation of the first three of the four *497 Schmerber requirements summarized in the majority opinion at pages 18-19 demonstrates their inapplicability. This blood was not "seized;" it was requested in a non-custodial setting in order to aid defendant to show that there was no cause for her to lose her driver's license, even temporarily.
In summary, I see the actions of the police in this matter initially to have been merely a performance of community caretaking, and finally to have been an accident investigation coupled with a belief that defendant was not under the influence of alcohol and a desire to aid her in presenting evidence to that effect. Under these circumstances the taking of a brief statement and her blood sample did not violate defendant's rights under Miranda, Berkemer or Schmerber.
I would affirm the decision of the trial judge admitting the oral statement, and would reverse the order suppressing the results of the blood analysis.
NOTES
[1] On appeal, the State contends the defendant's appeal as of right was improper and, as leave to cross-appeal was not granted, defendant's appeal should not be considered. We disagree. R. 2:4-2(a) permits a cross-appeal as of right where the cross-appeal pertains to the same aspect or provision of the underlying order under appeal pursuant to leave granted. In this instance the probable cause to obtain blood was interwoven with all the events that preceded the blood test, which include the oral statement of the defendant. As these events are interwoven and are not separate aspects of the evidentiary hearing conducted by the court, the cross-appeal as of right was correct. R. 2:4-2(a); Lanzet v. Greenberg, 222 N.J. Super. 540, 544-45, 537 A.2d 742 (App.Div. 1988).
[2] Our dissenting colleague asserts that we "attribute something nefarious to this statement." Whether we deem the comment, "Don't lose her," as nefarious is not significant. We emphasize that incident because those words were spoken by Curran to the taxicab driver in defendant's presence. Viewing that event objectively, we conceive that a detainee having heard the words, "Don't lose her," and who upon arrival at Englewood Hospital is again confronted by the same police officer who had escorted her to the taxicab in New York City, would perceive that the presence of the police was custodial. See State v. Coburn, supra, 221 N.J. Super. at 596, 535 A.2d 531; State v. Godfrey, supra, 131 N.J. Super. at 177, 329 A.2d 75.
[3] The "aided report" was ultimately completed on or about May 24, 1991.
[4] The dissent refers to N.J.S.A. 26:2B-16 as an example of the police performing a "community caretaking function." That statute is an example of a police function which is mandated by the Legislature. The "caretaking function" recognized in Cady v. Dombrowski was a recognition that police may voluntarily assume functions for legitimate reasons, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441, 93 S.Ct. at 2528, 37 L.Ed.2d at 715.

N.J.S.A. 26:2B-16 imposes a specific duty to provide transportation of publicly intoxicated persons to either their residence or to an intoxication treatment center. We note that where an intoxication treatment center is utilized, the police are not required to provide a "watchful eye" to guarantee that appropriate treatment is administered to or accepted by the transportee. N.J.S.A. 26:2B-15 imposes responsibility upon the administrator of the intoxication treatment facility, not the police who provide the transportation. We note that O'Loughlin was not deemed to be publicly intoxicated at the accident scene and any duty imposed under N.J.S.A. 26:2B-16 would be inapposite in this instance.
We additionally note that in this case, passenger Greene was visibly injured and visibly intoxicated. The dissent in footnote 2 asserts that the police conduct as to Greene is collateral. We disagree. The legitimacy of the concept of "community caretaking function," if utilized to gauge the police conduct as to defendant O'Loughlin, must be compared to the complete absence of the performance of any "caretaking function" as to passenger Greene who, without any medical treatment and while still visibly intoxicated, was permitted to leave Harlem Hospital and travel to Englewood Hospital in the private vehicle operated by Sandi Gaspari.
[5] Although probable cause to arrest is clearly mandated by Schmerber v. California, supra, 384 U.S. at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919, we do not agree that the arrest before or substantially contemporaneous to the search is mandated by Schmerber since it was not deemed a dispositive factor in State v. Dyal, 97 N.J. 229, 478 A.2d 390 (1984).
[6] As defendant's blood was seized at Englewood Hospital by trained medical personnel, this requirement under Schmerber, supra, has no significance in the disposition of the appeal.
[7] Based on our conclusion on Point I and Point II of defendant's cross-appeal, we need not consider the issues raised in Point III as raised by defendant.
[1] Cady discusses but one aspect of "community caretaking." Another is aiding intoxicated persons to their homes or for treatment, without arrest. N.J.S.A. 26:2B-16. I assume that still another is aiding motorists in need of medical attention, which function would necessarily include completing reports concerning such an activity.
[2] I do not understand the testimony of Officer Veale and Ms. Gaspari concerning the circling of the block in Ms. Gaspari's vehicle. But this incident is completely collateral to the issues before us as is the officers' treatment of defendant's companion. We have not been informed of the relative severity of their injuries.
[3] Although Officer Curran did not remember telling the taxi driver to bill his supervisor, Lieutenant Whittaker, this statement was obviously made. I see nothing nefarious about this statement.
[4] I have tried to evaluate the events both through the eyes of defendant and the police to show that a reasonable person in her circumstances would not have believed herself to be "in custody."
[5] While it is possible that the officers intended to charge defendant with careless or reckless driving, there is no indication of such intention, nor were any such complaints served on defendant.