708 A.2d 716

STATE OF NEW JERSEY, PLAINTIFF/RESPONDENT,
v. WILLIAM A. MCLAUGHLIN,
DEFENDANT/APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 10, 1998—Decided March 16, 1998.

244

246

Before Judges CONLEY, WALLACE and CARCHMAN.

*Ivelisse Torres,* Public Defender, attorney for appellant (*Charles H. Landesman,* Designated Counsel, of counsel and on the brief).

*Peter Verniero,* Attorney General, attorney for respondent (*Daniel I. Bornstein,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

WALLACE, J.A.D.

Defendant William A. McLaughlin was convicted of second degree conspiracy, *N.J.S.A.* 2C:5–2 (count one); second degree theft by deception, *N.J.S.A.* 2C:20–4 and *N.J.S.A.* 2C:2–6 (count two); fourth degree forgery, *N.J.S.A.* 2C:21–1(a) (count four); and fourth degree falsifying records, *N.J.S.A.* 2C:21–4(a) and *N.J.S.A.* 2C:2–6 (count five). The trial judge had previously dismissed count three, an official misconduct charge, at the end of the State's case.

At sentencing, defendant entered into a plea agreement for a separate indictment and pled guilty to third degree theft by deception, *N.J.S.A.* 2C:20–4 and *N.J.S.A.* 2C:2–6, and fourth-degree falsifying records, *N.J.S.A.* 2C:21–4a. As part of the agreement, the State recommended a sentence concurrent with the sentence for defendant's trial convictions and moved to dismiss two remaining counts. On the trial convictions, the trial court merged count one into count two and imposed a term of ten years with a two year parole disqualifier on count two, imposed a

concurrent term of eighteen months on count four, and imposed a concurrent term of eighteen months on count five. In addition, the trial court imposed fines of $270,000 payable to the Commissioner of Insurance and ordered defendant to pay restitution to the victim in the amount of $271,305.33. Consistent with the plea agreement, the trial court imposed a concurrent term of four years on the theft count and a concurrent term of nine months on the falsifying records count. The trial court also imposed a fine of $10,000 payable to the Commissioner of Insurance, ordered restitution of $8,000 and dismissed the two other counts in the indictment.

On appeal, defendant argues: (1) his statement was given in violation of his *Miranda*[1] rights and should not have been admitted into evidence; (2) the trial court erred in refusing to *voir dire* the members of the jury; (3) he was denied a fair trial when he was not permitted to retain counsel of his own choice; (4) the trial court erred in imposing a fine pursuant to *N.J.S.A.* 17:33A–5; and (5) the trial court failed to consider his ability to pay in ordering restitution. We find no error warranting reversal of defendant's convictions, but we are constrained to reverse the fines and restitution imposed.

# I

Between 1985 and 1990, defendant owned and operated American Truck and Equipment Appraisers, an insurance appraisal company. Defendant and his son-in-law, Joseph Hunter, appraised damaged vehicles and heavy equipment for insurance companies, such as USF & G, and were paid for their services on a per estimate basis. One of defendant's contacts at USF & G was claim supervisor, William Herbster.

According to Herbster, who was later indicted along with defendant and ultimately accepted a plea bargain, defendant ap-

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 444–45, 86 *S.Ct.* 1602, 1612–13, 16 *L. Ed.*2d 694, 706–07 (1966).

proached him in 1985 regarding a scheme to defraud USF & G. Defendant explained that he would encourage people to obtain automobile insurance with USF & G, submit phony claims on their behalf, and notify Herbster of the claims. Herbster agreed to watch for these claims, sign off on them, retrieve the checks before they were mailed to the claimants and insureds, and give the checks to defendant. Herbster testified that defendant assured him that he would recruit new insureds and would provide phony police reports, appraisals, and photos.

Hunter, who was also indicted and agreed to a plea bargain, confirmed that defendant worked with Herbster to collect on fraudulent insurance claims. He claimed that defendant kept a blank police report pad and mapped out accidents using "matchbox" cars. Further, he saw defendant endorse numerous checks payable to various people, some fictitious, and then cash them at cash checking stores.

Constance Hardison, who also accepted a plea bargain, maintained an office in her home where she worked as defendant's secretary. Hardison admitted she filled out phony police reports at defendant's direction. She stated that defendant kept a box of photographs of damaged cars which he would use for claims.

Robert Santopietro, a state investigator with the Insurance Fraud Section of the Division of Criminal Justice, testified that on June 11, 1991, he telephoned defendant who was then living in Florida. As a result of this conversation, defendant agreed to return to New Jersey to give a statement regarding certain insurance claims filed with USF & G. Santopietro claimed that defendant was cooperative, did not assert any of his rights, and gave a statement admitting his involvement in the submission of twenty-four fraudulent claims. Defendant's taped statements were played for the jury.

Defendant testified at trial. He admitted submitting false claims to USF & G and confirmed that he had prepared fake appraisals, supplied phony photos of wrecked vehicles, prepared phony police reports, and forged signatures when necessary. He

estimated that he stole approximately $607,550, but personally received only about $348,000, all of which he subsequently spent. He explained that in order to maintain his business, it was necessary for him to spend upwards of $80,000 per year "wining and dining" insurance company executives. He also revealed that he harbored a great resentment against insurance companies after several claims he submitted, in conjunction with the death of his wife and father and following an accident in which he sustained injuries, were unfairly denied.

As noted above, the jury convicted defendant of conspiracy, theft by deception, forgery, and falsifying records. This appeal followed.

## II

We first consider defendant's contentions that the trial court erred in failing to suppress his statement of June 15, 1991. Specifically, defendant argues that his statement was "tainted" because it was recorded after he had been subjected to two days of custodial interrogation which occurred without any explanation of his *Miranda* rights.

The critical facts as presented at the *Miranda* hearing follow. Santopietro, who had been involved in the USF & G investigation since its inception in 1987, telephoned defendant in Florida and asked him to fly to New Jersey to discuss his involvement with certain fraudulent USF & G insurance claims. Santopietro stated that defendant responded that he had been wondering when he was going to be contacted regarding the investigation. Defendant agreed to return to New Jersey if the State paid for his airfare. A round-trip ticket was subsequently purchased for defendant and he flew to Newark Airport the next day.

Santopietro and Investigator Allen Buecker met defendant at the Newark Airport and drove him to a motel near Trenton. After arranging to return the following morning to drive defendant to the Hughes Justice Complex, the investigators left the motel. No investigators were posted at the motel and defendant

retained his return airline ticket. Defendant was not restricted in any way.

The next morning, Buecker met defendant at the motel and drove him to the Justice Complex where Santopietro was waiting with three other investigators and a large number of insurance files in a grand jury room. The investigators were not armed and wore plain clothes. Prior to questioning defendant, Santopietro reminded him that his cooperation was voluntary and that he was free to leave. Defendant did not express any desire to leave either at that point or at any other point during the subsequent questioning. Santopietro stated that he made it clear to defendant that the goal of this initial questioning was defendant's refamiliarization with the files before giving a taped statement.

Santopietro took several breaks during the interview. Defendant was permitted to leave the room alone in order to use the restroom, the pay phone, and to get lunch at the cafeteria downstairs. He was given an allowance to cover food expenses and any additional transportation costs during his stay in New Jersey. Defendant returned to the grand jury room after lunch and continued to respond to Santopietro's questions. That evening Buecker transported defendant back to the motel and arranged to meet him the next morning.

Santopietro recalled that the next day proceeded in much the same manner. Prior to any questioning, Santopietro again advised defendant that his presence was voluntary. Because the interview was taking longer than expected, Santopietro asked defendant to postpone his return to Florida from Friday until Saturday. Defendant agreed. That evening, defendant was then driven back to his motel.

On Saturday, June 15, 1991, defendant was again transported to the Hughes Justice Complex. Defendant revealed that he had taken a cab to a nearby bar the prior evening to meet Andrew McElhenny, another target in the investigation, and that the two had spent the night in defendant's motel room. Thereafter, Santopietro once again reminded defendant that his presence was

entirely voluntary. A recording device was then placed on the table in front of defendant. Santopietro read defendant his *Miranda* rights. Defendant then read his rights back to Santopietro and signed a waiver form. Santopietro stated that defendant did not exercise any of his rights to remain silent or to have an attorney present. Defendant gave a recorded statement, admitting that he had committed insurance fraud. After the statement was completed, Santopietro and Buecker drove defendant to the airport for his return flight to Florida.

Santopietro acknowledged that defendant was a possible target of the investigation in June 1991, and that he had advised defendant, either during the telephone call or upon his arrival in New Jersey, that he had a right to counsel. Santopietro did agree however, that prior to Saturday, June 15, 1991, he did not read defendant his rights. Santopietro noted that there were no charges pending against defendant at the time of the interview and that he did not intend to arrest defendant at that time, even though defendant had admitted his involvement in the insurance fraud scheme on each day.

Based upon this testimony, the trial judge was satisfied that defendant was not in custody, that *Miranda* warnings were not necessary, and that defendant's statement had been given voluntarily.

It is clear that certain warnings are required when an individual is subjected to custodial interrogation by law enforcement officers. *Miranda v. Arizona*, 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L. Ed.*2d 694, 706–07 (1966). These warnings include instructing the individual that he has a right to remain silent, that any statement he makes may be used against him, and that he has the right to the presence of an attorney. *Stansbury v. California*, 511 *U.S.* 318, 321, 114 *S.Ct.* 1526, 1528, 128 *L. Ed.*2d 293, 298 (1994). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra*, 384 *U.S.* at 444, 86 *S.Ct.* at

1612, 16 *L. Ed.*2d at 706–07. *Accord Stansbury, supra,* 511 *U.S.* at 321, 114 *S.Ct.* at 1528, 128 *L. Ed.*2d at 298; *State v. Keating,* 277 *N.J.Super.* 141, 144, 649 *A.*2d 103 (App.Div.1994). In determining whether a custodial interrogation has occurred, a court must examine all of the circumstances surrounding the interrogation. *Stansbury, supra,* 511 *U.S.* at 321, 114 *S.Ct.* at 1528–29, 128 *L. Ed.*2d at 298; *State v. O'Loughlin,* 270 *N.J.Super.* 472, 477, 637 *A.*2d 553 (App.Div.1994); *State v. Coburn,* 221 *N.J.Super.* 586, 596, 535 *A.*2d 531 (App.Div.1987), *certif. denied,* 110 *N.J.* 300, 540 *A.*2d 1281 (1988).

■ Custody will be found " 'if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely.' " *O'Loughlin, supra,* 270 *N.J.Super.* at 477, 637 *A.*2d 553 (quoting *Coburn, supra,* 221 *N.J.Super.* at 596, 535 *A.*2d 531). Some of the relevant circumstances a court may consider in making this determination include the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police, the status of the suspect, and other such factors. *See State v. P.Z.,* 152 *N.J.* 86, 102–03, 703 *A.*2d 901 (1997); *State v. Smith,* 307 *N.J.Super.* 1, 9, 704 *A.*2d 73 (App.Div. 1997); *State v. Pierson,* 223 *N.J.Super.* 62, 67, 537 *A.*2d 1340 (App.Div.1988). This inquiry must be done on a case-by-case basis by examining the totality of the attendant circumstances. *O'Loughlin, supra,* 270 *N.J.Super.* at 477, 637 *A.*2d 553.

Defendant contends that his "interrogation" by Santopietro during the first two days of his stay in New Jersey was custodial because: (1) it took place in a state grand jury room or "a law enforcement location"; (2) during the lengthy "interrogation," defendant was cut off from the outside world; (3) it is "doubtful" defendant could have left the building at any point throughout the interrogation; (4) the State purchased defendant's airplane ticket, picked him up at the airport, and transported him to and from the Hughes Justice complex, thereby controlling defendant's move-

ments; and (5) the State selected his motel and determined his flight plans. We reject each of these arguments.

■ It is custodial interrogation and not the mere focus upon a particular suspect which implicates the requirement that the *Miranda* warnings be given. *State v. Graves,* 60 *N.J.* 441, 448, 291 *A.*2d 2 (1972); *Coburn, supra,* 221 *N.J.Super.* at 595, 535 *A.*2d 531. While the Hughes Justice Complex is a state building, it is not a police headquarters. None of the investigators present in the grand jury room wore uniforms or carried guns. Defendant was not cut off from the outside world; rather, he was offered numerous breaks during which he was permitted to freely move about the building, use the telephone and the restrooms, and purchase food. Defendant was also repeatedly reminded that he was free to leave at any time and that his participation was completely voluntary. Although the State did purchase defendant's airline ticket and provide him with free transportation, defendant was permitted to retain possession of his return ticket. No investigators were posted at his motel. Defendant admitted that he left the motel premises and had a guest in his room without the investigators' knowledge. Although the State selected the motel, the flight plans were agreed to with defendant. We are satisfied that there was sufficient credible evidence for the trial court to conclude that under the totality of the circumstances, defendant was not in custody. *State v. Johnson,* 42 *N.J.* 146, 164–65, 199 *A.*2d 809 (1964).

### III

■ Defendant next contends that the trial court erred in refusing to interview the jury individually after being informed by one of the jurors that other members of the jury were commenting on the case in the jury room in violation of the court's instruction not to discuss the case.

After four days of trial and near the end of the day, the court officer notified the trial court that a juror had stated to him that jurors had been discussing the case in the jury room. The officer

related that the juror stated the rest of the jury had "tried the man." Defense counsel immediately requested that the court voir dire juror, Kathryn DeAngelo. As DeAngelo had already left for the evening, the court agreed to interview her first thing the next morning.

The following day, out of the presence of the rest of the jurors, DeAngelo informed the court and counsel that her fellow jurors had been making "small comments" about the trial, such as about the amount of evidence being presented. DeAngelo did not believe that the comments were "significant," but she believed they were in violation of the court's instruction not to discuss the case. She felt compelled to repeatedly remind the other jurors that they were not supposed to be talking about the case. In response to the court's question, DeAngelo stated she could still be impartial.

Defense counsel immediately expressed his concern regarding the court officer's statement that the jury had already "tried the man," and asked that the full jury be voir dired on the matter. Specifically, defense counsel wanted further explanation about what had been said regarding the evidence and to obtain assurances that the jury was going to be fair.

The court agreed to speak with the entire panel, but noted that DeAngelo had not stated that any of the jurors had already made up their minds or that there had been discussion about the case "in substance." The court noted the obvious divergence between the stories of the court officer and DeAngelo and stated that a mere comment in the jury room without more would not be sufficient to mandate a mistrial. Because defense counsel remained unconvinced that the court officer had embellished upon DeAngelo's story, however, the court further inquired of DeAngelo as follows:

THE COURT: Ma'am, let me ask you one further question. The way it was related to the Court is that you felt it was unfair to you, that it's bothering you that these comments were going on, that you couldn't—you felt this was being unfair to you as a juror.

Is that correct, something along those lines?

THE JUROR: Yeah, I was getting uncomfortable because I mean, every day I would be making these comments to the other jurors.

THE COURT: Okay.

THE JUROR: And I really wanted to bring it to your attention.

THE COURT: Okay.

THE JUROR: Only because I thought may be if you were a little more emphatic with the jury in your statements before we were dismissed that maybe I wouldn't have to—I felt like, I mean, every session I was out there saying "Let's talk about the football game; let's talk about something else."

THE COURT: Now in these comments that were being made—

THE JUROR: (Interposing) Um-hum.

THE COURT: (Continuing)—you said nothing specific and there were no discussion of the case—

THE JUROR: (Interposing) No lengthy discussions. Not everybody was involved. It was just people—When they're not sitting there reading a book people have a tendency when they get in there, they're tired, have a tendency to make some comments. One person adds something else. At that point I'd say "We're not supposed to be talking about this stuff."

Thereafter, the court addressed the entire panel, explaining in detail the reasons why it was inappropriate for a juror to discuss a case at any point prior to final deliberations. The court then asked the panel whether there had been any discussions regarding the case. One of the jurors responded that there had been some comments about the personalities of the various participants in the trial. The court then cautioned the jury against any further discussions of this type and inquired whether any juror felt that he or she could not be fair and impartial in deciding the case. Another juror informed the court that only very general comments had been made, nothing which would be prejudicial to anyone. None of the jurors advised the court that he or she had become biased as a result of the jury room comments or could not be fair and impartial.

Although defense counsel requested that the court interview each juror individually, the trial court declined to do so, noting that he hadn't "heard anything from any juror saying anything occurred that should not have occurred." The court was satisfied that the jurors had not yet made up their minds and could hold

the State to its burden of proof and decide the case based upon the law.

Recently, we observed in *State v. Scherzer*, 301 *N.J.Super.* 363, 487–88, 694 *A.*2d 196 (App.Div.), *certif. denied*, 151 *N.J.* 466, 700 *A.*2d 878 (1997):

> The thrust of the New Jersey and federal cases of mid-trial allegations of jury misconduct is that the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality.

■ Both the New Jersey state and federal courts have applied the procedure developed in response to the problem of jury exposure to outside influences, such as trial publicity, to the problem of premature jury deliberations. *See, e.g., Scherzer, supra; see also, United States v. Resko*, 3 *F.*3d 684 (3d Cir.1993); *United States v. Bertoli*, 854 *F.Supp.* 975 (D.N.J.), *aff'd in part, vacated in part on other grounds*, 40 *F.*3d 1384 (3d Cir.1994). Specifically, this procedure requires a trial court to first determine whether the alleged improper conduct has the capacity to prejudice the defendant. If it does, the court should conduct voir dire, preferably individually and in camera, to determine the extent of juror exposure to the impropriety and whether the affected jurors are capable of deciding the case impartially. *Scherzer, supra*, 301 *N.J.Super.* at 487, 694 *A.*2d 196; *Resko, supra*, 3 *F.*3d at 691–94. A new trial is warranted where "jury misconduct ... 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" *Scherzer, supra*, 301 *N.J.Super.* at 486, 694 *A.*2d 196 (quoting *Panko v. Flintkote Co.*, 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951)); *accord Resko, supra*, 3 *F.*3d at 693–95.

■ The determination of the appropriate course of action upon a showing of premature deliberations is a matter left to the trial court's broad discretion. *Scherzer, supra*, 301 *N.J.Super.* at 488, 694 *A.*2d 196, *Bertoli*, 854 *F.Supp.* at 1095. Obviously, the extent of the court's inquiry depends upon the nature of the allegations.

Here, the record discloses that the trial court was diligent in its efforts to insure the jury would remain fair and impartial. After learning that the jury may have been prematurely discussing the case, the trial court questioned the one juror alone, and then addressed the entire jury. The trial court was satisfied that it was not necessary to individually voir dire each juror. The various jurors who responded to the judge's inquiries made it abundantly clear that the comments made by a few of the jurors did not pertain to the substance of the case. Under the circumstances here, we find no abuse of discretion in the trial court's refusal to separately question each juror.

## IV

Defendant next argues that the trial court committed reversible error by refusing to adjourn the trial to permit defendant to retain counsel of his choice. We do not agree.

On the first day of the *Miranda* hearing, defense counsel, who had been assigned to represent defendant based upon his asserted indigency, advised the court that defendant wanted to retain private counsel and sought an adjournment. Defense counsel related that defendant felt there was a conflict with respect to his current representation because defense counsel was being paid by the State and the State was also prosecuting him. Counsel also stated defendant had informed him that in the event the trial was not postponed, he would not cooperate with counsel.

The trial court denied defendant's request for an adjournment. The court noted that since his indictment defendant had had two and one-half years to hire an attorney on his own, and that instead, he had claimed indigency status and received the services of assigned counsel. Defendant argued that he had only recently secured the funds necessary to retain an attorney and that his present counsel never returned his phone calls, thereby precluding the preparation of an adequate defense. The trial court refused to alter its ruling finding that defendant's present counsel was qualified to represent him and defendant had had ample opportunity to

consult with him during the preceding days of court appearances. In the court's view, this was a "frivolous motion" which did not warrant a delay on the first day of trial.

The following day, defense counsel renewed his motion for an adjournment; advising the court that defendant had spoken with several attorneys regarding his case, including Steven B. Sacharow, Esq., of Sacharow, Adler, Gold, Taylor & Keyser. After acknowledging that he had not actually hired Sacharow and that Sacharow was not prepared to immediately take over the case, defendant produced a letter from Sacharow regarding his consultation. In this letter, Sacharow advised defendant that his firm would "not be in a position to undertake ... [defendant's] representation at the present time." Sacharow further stated that "if this matter were to be adjourned by the Court," he would be available to further discuss "the possibility of ... [his] firm undertaking representation of [defendant's] ... interest in this matter." According to defendant, he paid Sacharow a consultation fee of $1000.

Based upon the foregoing, the trial court ruled as follows:

> Sir, what this letter is basically saying is they can't represent you. Now if you get a postponement they will talk about it later. You have nothing definite, sir. I'm going to deny your request again for a postponement. We are in the middle of a hearing. There is no reason for delay, sir.
>
> As I indicated, this case has been around since May of 1992.
>
> Basically, we have begun the trial at this point. You are represented by able counsel. He's representing you, so I suggest you cooperate with him. It's to your best interest to do so, sir. And the matter is going to continue, sir. I'm not going to delay it at this point during the trial, sir.

Although the right to have the assistance of counsel is guaranteed by both the federal and state constitutions, *State v. Fusco*, 93 *N.J.* 578, 583, 461 *A.*2d 1169 (1983), the right to retain counsel of one's own choice is not absolute and " 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice and deprive such courts of the exercise of their inherent powers to control the same.' " *State v. Furguson*, 198 *N.J.Super.* 395, 401, 487 *A.*2d 730 (App.Div.) (quoting *Smith v. United States*, 288 *F.* 259, 261 (D.C.Cir.1923)), *certif. denied*, 101

*N.J.* 266, 501 *A.*2d 933 (1985). Rather, a defendant must act with reasonable diligence when exercising the right to choose his or her own counsel. *Furguson, supra,* 198 *N.J.Super.* at 401, 487 *A.*2d 730; *State v. McCombs,* 171 *N.J.Super.* 161, 165, 408 *A.*2d 434 (App.Div.1978), *aff'd,* 81 *N.J.* 373, 408 *A.*2d 425 (1979).

If a defendant fails to act with reasonable diligence in securing counsel, the trial court has the power to "do what is reasonably necessary to meet the situation." *State v. Yormark,* 117 *N.J.Super.* 315, 340, 284 *A.*2d 549 (App.Div.1971), *modified in part on other grounds, State v. Mulvaney,* 61 *N.J.* 202, 293 *A.*2d 668, *cert. denied,* 409 *U.S.* 862, 93 *S.Ct.* 151, 34 *L. Ed.*2d 109 (1972). This is because

> [t]he efficient administration of justice without unreasonable delay has great force and effect. The public has a strong interest in the prompt and effective operation of its judicial institutions. A trial court therefore must have the power to tightly control its own calendar so that the assignment of cases cannot be manipulated by the defense counsel or the defendant.
>
> [*Furguson, supra,* 198 *N.J.Super.* at 401, 487 *A.*2d 730.]

Consequently, a trial court's decision to deny a request for an adjournment to permit a defendant to retain counsel of his choice will not be deemed reversible error absent a showing of an abuse of discretion which caused defendant a "manifest wrong or injury." *Furguson, supra,* 198 *N.J.Super.* at 402, 487 *A.*2d 730.

The case of *State v. Reddy,* 137 *N.J.Super.* 32, 347 *A.*2d 545 (App.Div.1975), is instructive. In *Reddy,* two codefendants represented by public defenders moved during a suppression hearing two weeks before their scheduled trial for a continuance to obtain private counsel. *Id.* at 35, 347 *A.*2d 545. The judge denied defendants' request and proceeded with the hearing. *Ibid.* On appeal, we affirmed the lower court's ruling, noting that defendants' application contained no representations regarding "the availability or retainer of any particular counsel or proof of present financial ability to secure one." *Ibid.* We concluded that defendants' application made shortly before trial was nothing more than an effort to "disrupt and delay the judicial process." *Id.* at 35–36, 347 *A.*2d 545.

Although defendant attempts to distinguish *Reddy* by asserting that unlike the defendants in *Reddy*, he had demonstrated "some financial ability to retain private counsel," we find no meaningful distinction. Defendant had more than two and one-half years to retain private counsel. His claimed sudden wealth was unsubstantiated as to source, timing of receipt, and available amounts. Moreover, defendant's not yet retained private counsel was not prepared to try the case and had indicated that if the trial was postponed he was prepared to discuss the possibility of representing defendant. Thus, even if the trial had been postponed, defendant lacked a firm commitment from private counsel. Just as in *Reddy*, we find no abuse of discretion in the trial court's denial of defendant's motion to adjourn in order to retain private counsel, brought on the first day of his trial.

## V

Defendant argues for the first time on appeal that the fines imposed pursuant to *N.J.S.A.* 17:33A–5 be vacated because the lower court did not have jurisdiction to impose such fines. Additionally, defendant contends that the lower court inappropriately acted as a factfinder regarding the amount of the theft committed by the defendant and the corresponding number of fraudulent appraisals prepared by him. We agree that the trial court erred in imposing fines pursuant to *N.J.S.A.* 17:33A–5.

At sentencing, the State requested that the court impose a fine under the New Jersey Insurance Fraud Prevention Act, *N.J.S.A.* 17:33A–1 to –15 (the "Act"). Relying on the fine schedule established by *N.J.S.A.* 17:33A–5 and arguing that defendant had been involved with fifty-four fraudulent insurance appraisals (which resulted in twenty-four false claims being submitted to USF & G), the State sought a fine of $5,000 for the first offense, $10,000 for the second offense, and $15,000 for all of the remaining offenses, for a total fine of $795,000. In opposition, defense counsel did not address the jurisdiction of the court to impose a fine pursuant to the Act. He argued that the imposition of fifty-four separate fines

would constitute a violation of defendant's due process rights because the jury verdict gave no indication as to whether the jury believed that each of the fifty-four appraisals was fraudulent. Defense counsel then requested that the court impose only a minimal fine.

The trial judge imposed fines totaling $270,000, noting:

The Court in this matter is going to impose a fine under New Jersey Statute 17:33A-5, a Fraud Prevention Act, the Court is going to impose a fine based on each of the false appraisals. I sat as a judge in this case, and I am making a finding that each of these appraisals that were submitted in this matter was false, that the accidents did not occur, and I am going to impose a $5,000 fine for the appraisals and, therefore, there will be a $270,000 fine imposed under Title 17:33A-5, and that is payable to the Commissioner of Insurance.

Defendant now argues that because his convictions and sentences stem from criminal indictments brought by the State grand jury, as opposed to a "claim initiated by the commissioner," the trial court had no authority to impose fines pursuant to *N.J.S.A.* 17:33A-5(a). In response, the State argues that because a criminal court has the power to "impose any civil penalty" under *N.J.S.A.* 2C:43-2(d), the fines here were properly imposed, notwithstanding the apparently limiting language of *N.J.S.A.* 17:33A-5(a). Additionally, the State maintains that because the conduct upon which defendant's convictions were based was exactly the type of conduct proscribed by the Act, "it would be unreasonable and utterly senseless to require the Commissioner of Insurance, at this point in time, to institute a new claim against defendant, alleging the same conduct that was the subject of the criminal trial, in order to recover penalties under *N.J.S.A.* 17:33A-5."

At the time of the sentence below, *N.J.S.A.* 17:33A-5(a) provided:

If a person or practitioner is found by a court of competent jurisdiction, pursuant to a claim initiated by the commissioner, to have violated any provision of this act, the person or practitioner shall be subject to a civil penalty not to exceed $5,000.00 for the first violation, $10,000.00 for the second violation and $15,000.00 for each subsequent violation.

The contention that the Commissioner, and not the State or an individual insurer, must take some action against a defendant in

order to recover fines under *N.J.S.A.* 17:33A–5(a) is clearly expressed throughout the statute. Specifically, *N.J.S.A.* 17:33A–7(d) permits the Commissioner to join in a civil action brought by an insurer against a defendant "for the purpose of seeking judgment for the payment of a civil penalty authorized under section 5" of the Act. Likewise, *N.J.S.A.* 17:33A–11 also expresses that the Commissioner must file a claim in order to secure the fines available under the Act.

Further, the Legislature's recent amendment to *N.J.S.A.* 17:33A–5 supports the necessity of a separate civil action by the Commissioner. *See Matawan Borough v. Monmouth County Bd. of Taxation,* 51 *N.J.* 291, 299, 240 *A.2d* 8 (1968) ("An amendment to an act may be resorted to for discovery of legislative intent in the enactment amended.") The revised statute now reads in pertinent part as follows:

> a. Whenever the commissioner determines that a person has violated any provision of P.L.1983, c. 320 (C.17:33A–1 et seq.), *the commissioner* may either:
>
> (1) *bring a civil action* in accordance with subsection b. of this section; or
>
> (2) levy a civil administrative penalty and order restitution in accordance with subsection c. of this section.
>
> *In addition to or as an alternative to the remedies provided in this section, the commissioner may request the Attorney General to bring a criminal action under applicable criminal statutes* . . . .
>
> b. Any person who violates any provision of P.L.1983, c. 320 (C.17:33A–1 et seq.) shall be liable, *in a civil action brought by the commissioner in a court of competent jurisdiction,* for a penalty of not more than $5,000 for the first violation, $10,000 for the second violation and $15,000 for each subsequent violation. The penalty shall be paid to the commissioner to be used in accordance with subsection e. of this section. The court shall also award court costs and reasonable attorneys' fees to the commissioner.
>
> [*N.J.S.A.* 17:33A–5 (emphasis added).]

In our view, the Legislature intended that the fines available under the Act be recoverable in a civil action brought by the Commissioner of Insurance. Consequently, it was error for the trial court to impose the fines under *N.J.S.A.* 17:33A–5. We vacate the fines imposed pursuant to *N.J.S.A.* 17:33A–5(a), and remand the matter to the trial court to impose any fines pursuant to *N.J.S.A.* 2C:43–2a and (d). The latter subsection permits a

trial court to impose "any civil penalty" when sentencing a criminal defendant.

## VI

██ Defendant argues for the first time on appeal that the restitution ordered must be vacated because the sentencing court failed to consider his ability to pay such restitution.

At sentencing, the State asked that defendant be ordered to pay restitution to USF & G in the amount of $607,550, which it contended represented the amount "taken" from the victim through twenty-four false claims. The trial court ordered restitution in the amount of $271,305.33 to USF & G, representing the amount defendant admitted to have forged in checks. The court, however, made no findings relative to defendant's ability to pay restitution. Pursuant to *N.J.S.A.* 2C:44–2(b), "[t]he court shall sentence a defendant to pay restitution in addition to a sentence of imprisonment or probation that may be imposed if: ... (2)[t]he defendant is able to pay or, given a fair opportunity, will be able to pay restitution." Under *N.J.S.A.* 2C:44–2(c), "[i]n determining the amount and method of payment of restitution, the court shall take into account all financial resources of the defendant, including the defendant's likely future earnings, and shall set the amount of restitution so as to provide the victim with the fullest compensation for loss that is consistent with the defendant's ability to pay."

Our Supreme Court instructed in *State v. Newman,* 132 *N.J.* 159, 169, 623 *A.*2d 1355 (1993), "[a]t the time of defendant's sentencing, the court [is] required, before imposing a fine or restitution, to determine 'if the defendant is able, or given a fair opportunity to do so, will be able to pay the fine or make restitution or both.' *N.J.S.A.* 2C:44–2b." *See also Smith, supra,* 307 *N.J.Super.* at 15, 704 *A.*2d 73.

Although conceding that "[o]rdinarily, there should be a hearing concerning a criminal defendant's ability to pay restitution before restitution is imposed," the State, nonetheless, argues that no hearing was necessary here. In support of its position, the State

principally relies upon *State v. Orji,* 277 *N.J.Super.* 582, 589–90, 649 *A.*2d 1368 (App.Div.1994), where we held that under the circumstances presented, the trial court was not required to conduct a hearing regarding the defendant's ability to pay restitution where the defendant did not dispute his ability to pay at sentencing.

*Orji* is readily distinguishable from the instant case. First, the amount of restitution ordered in *Orji* was only $8,408.40, and the defendant was sentenced to a five-year probationary term conditioned upon serving 220 days in the county jail. Second, defense counsel had argued to the trial court that incarceration of Orji would be counterproductive to payment of restitution:

> If you wish to punish Mr. Orji further, obviously . . . [jail time] is one way to do it, but certainly he has $8,400 to pay as restitution, and as the expression goes, you can't get blood from a stone, you can't get blood from a person who is in jail.
>
> [*Id.* at 589, 649 *A.*2d 1368.]

Moreover, we recognized that "due process requires a hearing on both the ability to pay and the time period for making restitution." Nevertheless, we concluded that the circumstances of the case rendered a hearing unnecessary. *Id.* at 589–90, 649 *A.*2d 1368. Here, unlike in *Orji,* there was no mention by defense counsel of the likelihood of defendant paying restitution of $271,000—or any other amount—if not incarcerated.

The sentencing transcript is devoid of any mention of defendant's financial resources and/or his likely future earnings. Nor does the presentence report contain any information pertaining to defendant's ability to pay—it merely states: "The defendant's income, nor monthly payments toward credit card expenses was indicated. He is currently incarcerated in the Camden County Correctional Facility."

Thus, we remand for a hearing to determine defendant's ability to pay restitution. *See State v. Scribner,* 298 *N.J.Super.* 366, 372, 689 *A.*2d 789 (App.Div.), *certif. denied,* 150 *N.J.* 27, 695 *A.*2d 669 (1997). If after this hearing, the trial court decides to award restitution, it "should explain the reasons underlying its decision,

including the amount of restitution awarded and the terms of payment." *State v. Kennedy,* 152 *N.J.* 413, 705 *A.2d* 757 (1998).

In sum, we affirm defendant's convictions, but vacate the fines and restitution imposed and remand the matter for a hearing to determine defendant's ability to pay.