**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3309-21

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAMES R. SKINNER, a/k/a
JAMES SKINNER,

      Defendant-Appellant.

_____

> Argued October 29, 2024 – Decided January 10, 2025
>
> Before Judges Sumners and Bergman.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-05-0800.
>
> Scott M. Welfel, Assistant Deputy Public Defender argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Scott M. Welfel, of counsel and on the briefs).
>
> Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

PER CURIAM

Defendant appeals from convictions of third-degree burglary, N.J.S.A. 2C:18-2, and third-degree theft of movable property, N.J.S.A. 2C:20-3(a), after a jury trial. Defendant challenges his in-court identification, a detective's alleged improper trial testimony, the jury charge given related to identification, cumulative error, and the sentence imposed by the court. After our review of the record and applicable legal principles, we conclude defendant's challenges are unpersuasive and affirm.

I.

The facts which follow were developed at the trial held in September 2021. Defendant worked part-time at Kelly's Restaurant and Tavern (Tavern) in Neptune City for ten years prior to the charges which are the subject of this appeal. As an employee, his responsibilities included locking the day's cash earnings in a wooden box in a downstairs office at closing time. Tavern owner Kevin Kelly, Sr.[1] fired defendant in September 2015.

On February 1, 2016 at approximately 3:30 a.m., Kevin Dunn, who worked for the Tavern's beer distributor, arrived at the Tavern to service its draft

---

[1] Because the facts involve a father and son with the same name, we refer to them as Kevin Sr. and Kevin Jr., respectively. We intend no disrespect.

A-3309-21

beer lines. While Dunn cleaned the lines connected to the upstairs bar, a man walked into the Tavern at approximately 3:37 a.m. After exchanging greetings with the man, he walked away, and Dunn continued working. He saw the man again at approximately 3:45 a.m., also a third time at 3:51 a.m., at the downstairs bar. This time, they had a brief conversation and Dunn "g[o]t a clear look" at the man's face. Dunn saw him a final time when he left the Tavern at 4:30 a.m. As the man left the Tavern, he passed Tavern chef Jeffrey LaPoint. LaPoint did not "get a good look at" the man's face but believed he was with "the guy who cleans the beer lines."

When Dunn denied the man was with him, LaPoint became concerned why the man was in the Tavern during non-operating hours and called the police. When police arrived, Dunn told them the man had a beard but did not specify his hair color. He also told police the man "appeared to know his way around the area," but did not offer reasons for this statement. Dunn then left the Tavern to attend to his next job.

The police called Kevin, Sr.'s son, Kevin Kelly, Jr., one of the Tavern's managers and told him the Tavern may have been robbed. Upon reaching the Tavern, Kevin Jr. found someone had "disturbed" the "cash drawers" and "change boxes" in the downstairs office, which were locked. Accompanied by

police, Kevin Jr. accessed the Tavern's security camera footage from that morning. The footage showed the man "walk[ing] to the downstairs office area and stand[ing] at the door" before "walk[ing] back upstairs to the main bar to "remove[] the downstairs office door key lanyard" from behind the bar. The video then showed the man entered and left the office.

Based on the man's "walk, his mannerisms, his height, just everything about him" in the footage, Kevin Jr. testified that he recognized him as defendant. Shortly afterwards, Kevin Sr. also arrived and watched the footage with his son. He agreed the footage depicted defendant based on defendant's "distinctive walk, . . . height, and knowledge of the building. Kevin Sr. also determined "the entire weekend's cash earnings," totaling $12,443.56, were missing.

Neptune City Police detective Michael Vollbrecht arrived at the Tavern to investigate the incident. He spoke simultaneously with both Kellys and Tavern manager Christopher Lynch, who all recognized defendant as the man in the footage. When Vollbrecht documented this conversation two-and-a-half hours later, he stated he had also "felt the subject [of the footage] resembled James Skinner," as he was "familiar with Skinner" from growing up with him in Neptune City.

4

Dunn later returned to the Tavern around 10:30 a.m. at the request of one of the Kellys. With police present, Dunn told the Kellys the man had red hair and a chest tattoo and that he believed the man used to work at the Tavern. Dunn then accompanied the police to the police station, where Vollbrecht took his statement.

In his statement, Dunn described the man as bearded with red hair who walked "funny, like he may have been drunk" or "had something in his" buttocks. Dunn "thought he was an employee" at the Tavern "because [he] saw him on about three separate occasions while [he] was cleaning out the [beer] lines" in the past. Dunn added the man said something to him that morning that he had also said during one of their previous encounters. He said he did not know the man's name.

Meanwhile, the footage was shown to LaPoint, who recognized the man as defendant based on his appearance. LaPoint shared this belief with Lynch, who agreed with him. Later that day, Kevin Jr. also showed the footage to Tavern manager Timothy Hendricksen, who recognized the man as defendant after watching the footage for a "[f]ew minutes." He told Kevin Jr., who agreed with him.

A-3309-21

Defendant was arrested and a Monmouth County grand jury indicted him for third-degree burglary and third-degree theft of movable property. Before trial, defendant moved to suppress any in-court or out-of-court identification by Dunn, arguing Dunn identified him "under suggestive circumstances" because Dunn gave "more detail" in his formal statement to the police than in his initial "general description" earlier in the day. The court denied the motion. Relying on State v. Chen, 208 N.J. 307, 327 (2011), the judge determined there was no suggestiveness related to Dunn's identification of defendant, finding he identified defendant from their past in-person interactions.

The case was tried before a jury over six days. During the State's direct examination, Dunn described the man he saw as tall with red facial hair. When the prosecutor asked Dunn if he would "recognize him if [Dunn] saw him today?" and whether Dunn saw him "in the courtroom," Dunn responded "[y]es" both times and pointed to defendant who was seated at defense table. Defendant did not object to Dunn's in-court identification.

The State also played clips and showed stills from the surveillance footage to LaPoint, Kevin Jr., and Hendricksen, who each testified on direct examination that they recognized the man as defendant based on his appearance and manner of walking. LaPoint testified Lynch did not say who he thought the man was

6

when he showed LaPoint the footage. Hendricksen testified he watched the footage alone. As to whether Dunn watched the footage, Kevin Jr. and Dunn differed. Kevin Jr. testified Dunn watched it with him and Kevin Sr., but Dunn claimed the Kellys never showed it to him. Kevin Sr. testified he did not show the footage to Lynch, LaPoint, or Hendricksen. Kevin Sr. further testified parts of the Tavern required someone "really ha[d] to know how to maneuver in there" to find things. He added defendant would have known the keys were behind the bar because only employees would know to look there.

The State also called Vollbrecht, who testified he reviewed the full surveillance footage as part of his investigation. The prosecutor showed him a series of stills and short clips from the footage, asking questions about the selected footage. Most questions involved the Tavern's physical layout, particularly downstairs areas that Vollbrecht described as unorganized by his standards and "if you knew what was supposed to be there and where it was supposed to be, you would know where it is." At certain points, the prosecutor asked Vollbrecht to confirm which room a frame depicted, where the room was situated in the Tavern, or where certain doors or corridors led.

The prosecutor also showed Vollbrecht several stills and clips of the man moving through the Tavern and asked him to explain what they showed the man

7

doing.  In some instances, Vollbrecht testified as to which room the man was entering or leaving but others described different details of the clips.

The following colloquy occurred between the prosecutor and Vollbrecht:

    Q      Does this photo have any significance?

    A      Yeah, the subject appeared to be shielding his
           face from the camera.

    Q      Okay.  What did that tell you?

    A      That he knew where the camera was.

           . . . .

    Q      Does there appear to be anything in the subject's
           hand?

    A      Yes.

    Q      Could you say what it is?

    A      Not specifically.

    Q      And . . . is he [going to] try to do anything with
           that?

    A      Looks like he's trying to manipulate the door,
           that door handle with it.

    Q      Okay.  Was he successful?

    A      No.

           . . . .

8

Q    What does it appear that the subject is doing in this area?

A    Obtaining the manager's key that's on a lanyard behind the cash register.

Q    Is that plainly visible?

A    No.

Q    Are the keys marked?

A    No.

Q    Based on your investigation, who knows that the keys are there?

A    It could only be employees.

        . . . .

Q    Does the suspect appear to be covering his face here?

A    Yes.

Q    In this photo?

A    Not yet.

Q    Okay.  How about in [this still]?

A    Yes.

Q    Why would he cover his face here?

A    The presence of the camera.

A-3309-21

The prosecutor also asked Vollbrecht whether the man "appeared to be carrying a full book bag or another item on his back."  Vollbrecht answered the bag "looked full."

At the charge conference, the court asked defendant's counsel to review the State's proposed jury charges for approval or to make any suggested changes. Defense counsel suggested changes unrelated to this appeal.  The court's final jury charges included the following language:

> It is your function to determine whether the witnesses['] identification of defendant is reliable and believable, or whether it is based on a mistake or for any reason is not worthy of belief.
>
>       . . . .
>
> You may consider whether the witness was exposed to opinions, descriptions, or identifications given by other witnesses . . . or to any other information or . . . influence[] that may have affected the independence of his or her identification.  Such information can affect the independent nature and reliability of a witness identification and inflate the witness's confidence in the identification.
>
>       . . . .
>
> If, after consideration of all of the evidence, you determine that the State has not proven beyond a reasonable doubt that James Skinner was the person who committed one or more of these offenses, you must find him not guilty of such offenses.

A-3309-21

After deliberation, the jury convicted defendant on both counts. The court sentenced defendant to two concurrent five-year probation terms, one hundred twenty hours of community service, and payment of $12,443.56 in restitution. The restitution payments were to be made "over the period of probation in equal monthly installments" as a condition of defendant's probation. The court also ordered defendant to pay a $25 monthly probation supervision fee during his five years of probation, totaling $1,500.

As to defendant's sentence, the court recognized defendant was a high school graduate with sixteen years of bartending and hospitality experience, as well as work experience in construction and for a "tree service." It acknowledged defendant was forty-one years old with no disabilities. It further recognized he was consistently employed until the COVID-19 pandemic began in 2020. Lastly, the court recognized defendant was in the process of earning a commercial driver's license and planned to find a job in the trucking industry. Considering these facts, the court found defendant has "the wherewithal to meet [the] financial obligations imposed by the court, including the payment of restitution," and nothing appeared to "impede his ability to be gainfully employed."

Defendant raises the following points on appeal:

A-3309-21

POINT I

THE COURT ERRED IN ALLOWING KEVIN DUNN
TO IDENTIFY DEFENDANT FOR THE FIRST TIME
AT TRIAL.

POINT II

THE STATE ELICITED INADMISSIBLE LAY
OPINION TESTIMONY FROM DETECTIVE
VOLLBRECHT REGARDING WHAT THE
SURVEILLANCE SHOWED AND WHY THE
SUSPECT DID CERTAIN ACTIONS, WHICH
IMPERMISSIBLY BOLSTERED THE STATE'S
THEORY THAT THE SUSPECT MUST HAVE BEEN
AN EMPLOYEE OF KELLY'S TAVERN.

POINT III

IT WAS PLAIN ERROR TO FAIL TO INSTRUCT
THE JURY ON THE PORTION OF THE
IDENTIFICATION CHARGE CONCERNING THE
INFLUENCE OF FEEDBACK.

POINT IV

THE CUMULATIVE IMPACT OF THE ERRORS
DENIED DEFENDANT DUE PROCESS AND A
FAIR TRIAL.

POINT V

BECAUSE THE SENTENCING COURT FAILED TO
ASSESS DEFENDANT'S FINANCIAL MEANS AND
HIS ABILITY TO PAY THE $12,443.56 IN
RESTITUTION AND $1,500 IN PROBATION
SUPERVISION FEES, THIS COURT SHOULD
REVERSE THESE AMOUNTS AND REMAND FOR

CONSIDERATION OF DEFENDANT'S FINANCIAL MEANS.

## II.

In reviewing a grant or denial of a motion to suppress, we "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014). A trial court's findings on the admissibility of identification evidence are "entitled to very considerable weight." State v. Farrow, 61 N.J. 434, 451 (1972). A finding that the identification procedures were reliable should not be disturbed unless they fail the sufficient credible evidence standard of review. State v. Adams, 194 N.J. 186, 203 (2008).

## A.

We first address defendant's challenge that Dunn's in-court identification of him should have been suppressed relying upon our Court's holding in State v. Watson, 254 N.J. 558 (2023). We disagree. The trial and verdict in this matter occurred prior to Watson being decided. The Court in Watson clearly concluded its holding only applied prospectively when it found "[w]e apply the above [identification] standard here and provide clearer rules going forward. Today's holding applies to this and future cases." 254 N.J. at 589.

Defendant alternatively argues the motion court erred by applying the wrong standard and not holding a <u>Wade/Henderson</u>[2] hearing. When applying the foregoing principles, we find no abuse of discretion by the court's denial of defendant's motion seeking to suppress Dunn's identification or by permitting the in-court identification testimony of Dunn.

In New Jersey, for a defendant to be entitled to a <u>Wade/Henderson</u> hearing, the defendant must first "proffer . . . some evidence of impermissible suggestiveness" which could lead to a mistaken identification. <u>Henderson</u>, 208 N.J. at 238 (quoting <u>State v. Rodriguez</u>, 264 N.J. Super. 261, 269 (App. Div. 1993)). If a defendant presents sufficient evidence of impermissible suggestiveness, the court should conduct an evidentiary hearing where the State must offer proof that the proffered eyewitness identification is reliable based on an analysis of several variables. <u>Id.</u> at 288-89.

However, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." <u>Id.</u> at 289. The court then determines, based on a totality of the circumstances, whether defendant has met that burden and the court should suppress the identification evidence. <u>Ibid.</u>

---

[2] <u>United States v. Wade</u>, 388 U.S. 218 (1967); <u>State v. Henderson</u>, 208 N.J. 208 (2011).

Our Supreme Court has noted, however, that a Wade/Henderson hearing is not required for a "confirmatory" identification, "which is not considered suggestive." State v. Pressley, 232 N.J. 587, 592 (2018). "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." Id. at 592-93 (citing National Research Council, Identifying the Culprit: Assessing Eyewitness Identification 28 (2014)). The Court noted, by way of example, that the person identified "may be a neighbor or someone known only by a street name." Id. at 593 (citing Identifying the Culprit, at 22).

Dunn previously provided the police with detailed descriptions of the burglar as having red hair, beard and a chest tattoo. Dunn testified he had seen defendant in the Tavern four times during the burglary and had seen and interacted with defendant in the past. Although he did not know defendant's name, Dunn testified he had seen and spoken with defendant multiple times when defendant was a Tavern employee. We further conclude the defense had ample opportunity at trial to cross-examine Dunn to diminish the reliability of his in-court identification.

We recognize our reasoning differs from that of the trial court, but "[i]t is a long-standing principle underlying appellate review that 'appeals are taken

from orders and judgments and not from opinions . . . or reasons given for the ultimate conclusion.'" State v. Washington, 453 N.J. Super. 164, 203-204 (App. Div. 2018) citing State v. Scott, 229 N.J. 469, 479 (2017). "[B]ecause an appeal is taken from a trial court's ruling rather than reasons for the ruling, we may rely on grounds other than those upon which the trial court relied." Washington at 204 citing State v. Adubato, 420 N.J. Super. 167, 176 (App. Div. 2011). See also, e.g., Hayes v. Delamotte, 231 N.J. 373, 387 (2018) ("A trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning"). Therefore, we determine Dunn's identification was constitutionally valid as a confirmatory identification.

B.

We now turn to defendant's argument raised for the first time on appeal that the court erred by permitting certain testimony of Detective Vollbrecht. This court reviews alleged trial errors for plain error when raised for the first time on appeal. State v. McGuigan, 478 N.J. Super. 284, 291 (App. Div. 2024). Under the plain error standard, an error warrants reversal "if it was 'clearly capable of producing an unjust result,'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2), and creates "reasonable doubt as to whether the error led

16

the jury to a result it otherwise might not have reached." State v. Jordan, 147 N.J. 409, 422 (1997).

We conclude defendant's argument fails to satisfy the plain error standard. Although Vollbrecht's testimony was a narrative at certain times and portions of his testimony were not based on his personal knowledge, his testimony did not have the clear capacity to produce an unjust result and failed to create reasonable doubt which caused the jury to find him guilty of the charged offenses.

The challenged testimony of Vollbrecht was a small part of the cumulative identification evidence of defendant by the witnesses. Kevin Jr. testified he recognized the person on the video as defendant based on the man's "walk, his mannerisms, his height, just everything about him." Kevin Sr. testified he watched the footage and agreed the footage depicted defendant based on defendant's "distinctive walk, . . . height, and knowledge of the building." Kevin Sr. further testified parts of the Tavern required someone "really ha[d] to know how to maneuver in there" to find things. He added Skinner would have known the keys were behind the bar because "only employees would know to look there." Lynch testified he recognized defendant as the man in the footage. Vollbrecht opined he had also "felt the subject [of the footage] resembled James Skinner," as he was "familiar with Skinner" from growing up in Neptune City.

17

Dunn's testimony described the man as bearded with red hair who walked "funny, like he may have been drunk" or "had something in his" buttocks. Dunn testified he "thought he was an employee" at the Tavern "because [he] saw him on about three separate occasions while [he] was cleaning out the [beer] lines" in the past. LaPoint testified he recognized the man as defendant based on his appearance. Hendricksen also testified he recognized the man as defendant after watching the footage for a "[f]ew minutes."

Those other witnesses also testified to the person's location, movements and the person's familiarity with the Tavern. Also, the jury viewed the video at trial and had the opportunity to determine whether the person was defendant when considering the video and other evidence elicited at trial.

We further conclude, even assuming the trial court committed plain error by permitting Vollbrecht's testimony, any such error was harmless. Under the harmless error doctrine, "[a]ny error or omission shall be disregarded . . . unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. See also State v. Macon, 57 N.J. 325, 338 (1971) (an appellate court must determine "whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits"). For the same reasons we previously stated when addressing

18

Detective Vollbrecht's testimony under the plain error standard, we conclude the alleged error posited by defendant was harmless.

## III.

We now turn to defendant's argument that the court's failure to instruct the jury on the portion of the identification charge concerning the influence of feedback constituted plain error.  After our review of the charge given by the court, we conclude it clearly did not have the capacity for the jury to reach an unjust result.

Defendant contends the trial court "inexplicably omitted" any mention of witness feedback from its jury instructions.  He argues the court had to explicitly charge the jury on feedback because Kevin Sr., Kevin Jr., LaPoint, and Hendricksen told each other who they thought was the man in the footage, and the possibility of feedback was "central" to defendant's defense that their identifications were unreliable.  Defendant points out our Model Jury Charges address this precise situation because feedback can "distort memory, create a false sense of confidence, and alter a witness' report of how [they] viewed an event," as our Supreme Court acknowledged in Henderson, 208 N.J. at 255.

The State contends the court's jury charges were not plain error, arguing the court "made clear to the jury that because even good-faith identifications

could be mistaken, it was important for the jury to scrutinize identification testimony for outside influences." Specifically, the State points to the court's instruction, "you should also consider the circumstances under which any out-of-court identification was made, and whether it was the result of a suggestive procedure." The State acknowledges the court did not use defendant's "now-preferred wording" but contends the jury charges did not counteract the considerable evidence it presented against defendant.

Model Jury Charges (Criminal), "Identifications: In-Court and Out-of Court Identifications," at 11 (rev. May 18, 2020), includes the following language:

> Feedback occurs when police officers, or witnesses to an event who are not law enforcement officials, signal to eyewitnesses that they correctly identified the suspect. That confirmation may reduce doubt and engender or produce a false sense of confidence in a witness. Feedback may also falsely enhance a witness's recollection of the quality of his or her view of an event. It is for you to determine whether or not a witness's recollection in this case was affected by feedback or whether the recollection instead reflects the witness's accurate perception of the event.

We conclude that even though the court's jury instructions failed to include the above "feedback" instruction, they were sufficient because the jury was alerted to consider the possibility that a witness's testimony could be

20

influenced by "opinions, descriptions, or identifications given by other witnesses."  The court further warned the jury that witnesses can misidentify suspects in general, and it was the jury's responsibility to find an identification was reliable.  We determine defendant advances no sound argument to show using the "feedback" instruction to describe these concepts would have altered the jury's verdict.  Thus, we conclude any discrepancies between the court's jury instruction and those argued by defendant were not plain error because we conclude they were not "clearly capable of producing an unjust result."  See R. 2:10-2.

## IV.

Turning to defendant's argument that cumulative error by the court requires reversal and a new trial, we posit that "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007). Because we have addressed and rejected each of defendant's arguments of asserted error, we conclude defendant's position on appeal that the cumulative impact of the errors denied defendant due process and a fair trial holds no merit.

## V.

Finally, we address defendant's argument that the trial court's sentence failed to assess defendant's financial means and his ability to pay before imposing $12,443.56 in restitution and $1,500 in probation supervision fees against defendant. Defendant asserts this failure requires us to remand the matter to the court to consider defendant's financial means.

Defendant contends the court failed to consider his financial resources or "likely future earnings" before ordering him to pay restitution, as required by N.J.S.A. 2C:44-2(c)(2). He argues the court did not examine the salary he earned in his previous jobs or estimate the salary he could earn from any future job. He further claims the court did not compare any projected future salary with his expenses. He compares his financial circumstances to those at issue in State v. Pessolano, 343 N.J. Super. 464, 479 (App. Div. 2001), where the defendant's unemployed status affected his ability to make restitution.

Defendant also argues the court set forth no factual basis to impose a $25 monthly probation supervision fee, the maximum permitted by statute, N.J.S.A. 2C:45-1(d)(1). He asserts courts must consider a defendant's ability to pay the fee when setting the amount of fees owed, just as when ordering restitution. He further claims "the amount of the probation supervision fee in any individual

22

case must be set in a manner" that does not "impede[] th[e] defendant's ability to pay restitution" on top of the fee.

We are unpersuaded. As pointed out by the State, defendant did not challenge the fairness of the restitution or request the trial court to order less than full restitution. We conclude our holding in State v. Orji, 277 N.J. Super. 582 (App. Div. 1994) is apposite. In Orji, we concluded the trial court properly "inferred [the] defendant has the ability to pay" and did not need to hold a restitution hearing once the defendant conceded he had adequate financial resources to make full restitution. 277 N.J. Super. at 589.

The court's determination also comports with the plain language in the sentencing statutes, which states, "The court shall sentence a defendant to pay restitution" if "[t]he defendant is able to pay or, given a fair opportunity, will be able to pay restitution." N.J.S.A. 2C:44-2(b)(2) (emphasis added). The statute further defines "all financial resources of the defendant" as "including the defendant's likely future earnings." Ibid. In reviewing defendant's employment history, his progress towards a commercial driver's license, and the fact that he did not challenge the appropriateness or amount of restitution the State sought, we determine the court took into account defendant's future ability to pay. Cf. State v. McLaughlin, 310 N.J. Super. 242, 264 (App. Div. 1998) (remanding for

23

restitution hearing where the trial record contained no mention of the defendant's likely future earnings).

Concerning the probation supervision fee, we conclude nothing in the governing statute suggests the requirement to consider the defendant's ability to pay extends to this fee. N.J.S.A. 2C:45-1(d)(1) cited by defendant only contemplates the fee or fees "may be waived in cases of indigency upon application by the chief probation officer to the sentencing court." The record does not indicate such an application was made here. Further, we determine defendant conflates the probation supervision fee under N.J.S.A. 2C:45-1 with the fines contemplated in N.J.S.A. 2C:44-2, which are imposed when the defendant "derived a pecuniary gain from the offense or the court" believes "a fine is specially adapted to" deter that offense. N.J.S.A. 2C:44-2(a)(1). The court is to consider the defendant's ability to pay the fine on top of restitution under N.J.S.A. 2C:44-2(a)(2) and (3). No reference in the statute cited by defendant is applicable to the probation supervision fee which we conclude is not applicable to the above referenced statute. Ibid.

Therefore, we conclude the trial court properly considered defendant's financial resources when ordering him to pay full restitution and the maximum permitted probation supervision fee.

24

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION