**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3143-20

DONNA MACRI FATOVIC,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

DAMIR FATOVIC,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued December 19, 2023 – Decided January 9, 2024

Before Judges Mayer, Enright and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1782-18.

Robert A. Skoblar argued the cause for appellant/cross-respondent (Skoblar Law, PC, attorneys; Robert A. Skoblar, on the briefs).

Bonnie C. Frost argued the cause for respondent/cross-appellant (Einhorn, Barbarito, Frost & Botwinick, attorneys; Bonnie C. Frost, Matheu D. Nunn and Jessie M. Mills, on the briefs).

PER CURIAM

In this highly contentious divorce case, defendant Damir Fatovic appeals from a March 10, 2021 judgment of divorce (JOD) and a June 11, 2021 amended JOD (AJOD).  Plaintiff Donna Macri Fatovic cross-appeals from an October 29, 2021 order granting her a $25,000 counsel fee award, arguing the award is inadequate.  We affirm the challenged judgments and order, substantially for the reasons set forth by Judge Darren T. DiBiasi in his well-reasoned oral opinions.

I.

Because we write for the parties, we need only summarize the relevant factual and procedural history of this matter.  In June 1998, two days before the parties wed, they entered into a prenuptial agreement (PNA).  The PNA stated, in part:

> It is the intention of the parties in entering into this Agreement that in the event of an end to the[ir] marriage[,] . . . their rights shall be fixed in advance . . . .  <u>It is their intention to avoid litigation and intrusion into their professional and personal lives, which would perhaps otherwise occur if this Agreement had not been entered into</u>. . . .

> <u>It is the intention of the parties to create limited joint property during the marriage</u>.  The joint property to be created shall be confined to any joint checking account maintained by the parties and gifts given to the parties jointly.  With the exception of these assets, all other property acquired by either party shall be

2

> considered their sole and separate property unless title is placed in joint names.
>
> [(Emphasis added).]

The parties also agreed under the PNA: (1) each party's premarital property would "remain the separate property of the respective parties"; (2) each party's earned income during the marriage would be "joint marital property," but plaintiff was entitled to retain "income realized by [her] from gifted, inherited[,] or premarital assets"; and (3) if the marriage ended, defendant waived any right to alimony, but plaintiff could receive alimony if she was the "primary caretaker" for any children born of the marriage, and "the parties mutually . . . agree[d] that [she] should discontinue her employment."

The parties remained married for almost twenty years and had two children together, a daughter, born in 2001, and a son, born in 2008. On February 11, 2018, plaintiff obtained a temporary restraining order (TRO) against defendant. Defendant obtained a TRO against plaintiff two days later. Within a week, the parties dismissed the TROs and entered into a consent order providing for mutual civil restraints. Also in February 2018, plaintiff filed a complaint for divorce.

In November 2018, the parties and their counsel executed a confidentiality agreement (CA). The CA limited the ability of defendant and his attorney to

review certain financial and private information plaintiff deemed confidential, including information:

> [R]elating to and/or involving [her] non-marital/gifted/ inherited/entities in Trust (specifically the Donna Macri Fatovic Trust and the Macri Complete Trust) and any and all financial holdings non-marital and of any Trust, including but not limited to accounts, financial statements, real property, investments and the like.

Two months later, the parties signed another agreement entitled, "Agreement Regarding Certain Issues." Under this agreement, defendant withdrew "any claim he ha[d] to review and/or obtain information about the Macri Complete Trust," and both parties agreed not to "seek alimony or any other form of spousal support from [each] other." Contemporaneously, the parties executed a Custody and Parenting Agreement (CPA). The CPA provided they would have joint legal custody of the children and "share physical custody" based on "a flexible parenting time schedule for the children's benefit," without designating either party as the parent of primary residence.

Although the parties successfully resolved many of their matrimonial issues, they continually argued over discovery matters. In July 2019, the judge then assigned to the parties' case entered an order denying plaintiff's motion to quash various subpoenas issued by defendant's counsel. But the judge also directed that documents submitted in response to defendant's subpoenas would

4

be held by his attorney "to ensure . . . no discovery [wa]s provided to [d]efendant that the parties agree[d wa]s not discoverable" "or that [wa]s subject to [the CA]," including the Macri Complete Trust. Additionally, the judge granted defendant's motion to compel plaintiff to "file a complete updated Case Information Statement [(CIS)], with all required attachments, disclosing any and all accounts she h[eld] . . . exclusive of the Macri Complete Trust." Further, the judge directed defendant to file an updated CIS and that both parties "answer any discovery deficiencies."

Months later, during intensive settlement conferences (ISCs) on October 29, and November 14, 2019, the parties resolved additional financial issues. On October 29, 2019, they agreed to divide proceeds from the sale of the former marital home, with defendant receiving fifty-six percent of the proceeds and plaintiff receiving forty-four percent of the proceeds, after the parties deposited $40,000 from the sale proceeds into their son's 529 account. Counsel for the parties also stated during the October 29 ISC that both parties agreed to waive "all credits" each claimed against the other, except for an "ALCA account,"[1] which remained in dispute. During questioning by Judge DiBiasi, the parties

---

[1] The ALCA account also is referenced in the record as the "ALKA" or "Alka account."

A-3143-20

represented to the judge they: understood the oral agreement; were voluntarily entering into it; had enough time to consider its terms; were satisfied with their attorney's services; and understood that "by committing to the[] terms [of the agreement]," they were "waiving [their] right to have a trial on th[o]se issues."

During the November 14, 2019 ISC, with the assistance of counsel and the court, the parties orally agreed to equally divide the ALCA account, which was worth less than $3,000. They also agreed to share responsibility for marital tax debts and certain expenses associated with the former marital residence. Before the ISC concluded, the parties confirmed to Judge DiBiasi that they entered into the oral agreement voluntarily; they were not "under the influence of any substances" that would affect their ability "to think clearly"; they had sufficient time to consult with their attorneys about the agreement; and were satisfied with their attorneys' services. The judge then directed "counsel to draft a [marital] settlement agreement [(MSA)] incorporating all of the[] terms" agreed upon between the parties to date and ordered the parties to return to court the following month.

The parties never signed an MSA following the November 2019 ISC. In March 2020, defendant's fourth attorney moved to be relieved as counsel over defendant's objection. Judge DiBiasi granted counsel's application immediately

6

following argument on May 22, 2020, finding defendant not only breached his retainer agreement, but his relationship with his attorney was "broken." However, the judge also informed defendant "if [he] wish[ed] to retain an attorney, [he] ha[d] time" to do so prior to trial.

Considering the parties' inability to agree on the form and entry of an MSA, Judge DiBiasi entered an order on June 5, 2020, setting forth the terms of the parties' oral agreements from the October and November 2019 ISCs. The judge's order also gave the parties ten days to submit a list of the remaining issues they believed had to be tried.

Less than two weeks later, the parties virtually appeared for a pretrial conference. At the hearing, Judge DiBiasi acknowledged receiving the parties' lists of trial issues and noted defendant's list was fifteen pages long, "single-space[d and in] small font." Judge DiBiasi told defendant he was "a little overwhelmed" by defendant's list, and "having a tough time reconciling [defendant's stated] objective to . . . avoid a trial," considering defendant's lengthy "list of requests." Before concluding the hearing, the judge encouraged the parties to continue trying to resolve their outstanding issues.

The parties virtually appeared in court again in June 2020, after defendant submitted a pared-down list of trial issues to Judge DiBiasi. At the hearing,

defendant disputed that he waived certain credits during the October and November ISCs. Accordingly, the judge took a brief recess to review the record from the ISC hearings. Following his review, the judge confirmed to the parties that during the October and November 2019 ISCs, plaintiff's attorney "state[d] on the record that part of the settlement was the waiver of all credits. And [defendant's attorney] echoed that understanding, and added some important language that it was not just [defendant] who was waiving credits . . . . It was a mutual waiver of credits." Therefore, the judge instructed the matter would proceed to trial on July 6, 2020, and if defendant "attempt[ed] . . . to bring up the credits again" at trial, the judge was "going to remind [him] that the credits [we]re waived."

On June 22, 2020, the judge issued a case management order (CMO), scheduling the trial for July 6 and 9, 2020. The CMO also provided: "the parties mutually waived their rights to request credits from the other party during the October 29 . . . and November 13, 2019 settlement conferences. The court will not hear testimony as to this issue."

Three days after the judge entered the CMO, and less than two weeks before the trial was scheduled to commence, Robert Skoblar, Esq.[2] wrote to

---

[2] Skoblar represents defendant on this appeal.

Judge DiBiasi, seeking to adjourn the trial "for at least four weeks" to allow Skoblar to represent defendant. Skoblar stated he had "many prior commitments" and could "only agree to become involved" on defendant's behalf if the judge granted the adjournment. Judge DiBiasi denied the adjournment request.

When the parties virtually appeared for trial on July 6, defendant argued plaintiff's July 5, 2020 CIS was incomplete because she listed the values of certain assets on her CIS as "TBD," meaning the value had yet "to be determined." Defendant asked the judge, "should I be including my personal accounts [on my CIS] if she's not?" Plaintiff's counsel responded that defendant "ha[d] received voluminous . . . documents with regard to the[] accounts in question. So therefore, if [defendant] want[ed] to know what the account balances were, he certainly c[ould] go look them up himself." The judge interjected that he understood there was "a stipulation [the parties would] divide . . . marital accounts [equally]." He later explained, "I would have intervened earlier about some of the confusion regarding the TBD [references in plaintiff's CIS]. But . . . the focus is . . . regarding marital accounts. That's what need[s] to be divided, not exempt accounts."

A-3143-20

Following this discussion, defendant placed a global settlement offer on the record to resolve the parties' remaining financial issues. Judge DiBiasi acknowledged it "was a good-faith settlement offer." However, plaintiff did not accept or reject the offer. Instead, she asked for additional time to consider it.

With Judge DiBiasi's assistance, the parties continued their virtual settlement discussions on July 9, and July 27, 2020, and reached a resolution on a myriad of issues, including an agreement to waive child support payments from each other. After eliciting testimony from the parties, the judge found the parties: understood the terms of this most recent agreement; entered into it voluntarily; and understood they were waiving their right to a trial on any issues resolved under the July 2020 agreement.

On August 12, 2020, Judge DiBiasi executed another CMO. The CMO stated, "[t]he parties . . . substantially resolved all outstanding issues. The [c]ourt [will be] incorporating the settlement terms into a [JOD]." Additionally, the CMO stated the trial would begin on September 8, 2020, and Judge DiBiasi would "hear limited testimony" on four remaining equitable distribution issues: (1) whether plaintiff's TD Bank ITF checking account was a marital asset subject to equitable distribution; (2) how to equitably distribute airline miles and credit card points acquired during the marriage; (3) whether plaintiff's 2017 and 2018

10

restricted cash units (RCUs) were subject to equitable distribution; and (4) whether certain retirement accounts held by defendant were subject to equitable distribution.

Five days prior to the September 8 trial date, rather than file a formal motion, defendant sent a four-page email to Judge DiBiasi, seeking relief on various issues. For example, he requested time to serve subpoenas on plaintiff's employer and TD Bank, and an adjournment of the trial so defendant could "gather the missing information." He also asked Judge DiBiasi to order plaintiff "to provide an accurate and complete CIS," alleging she "answer[ed] 'TBD' down the line to the questions" on her CIS and "le[ft] out accounts and assets."

The trial proceeded as scheduled on September 8, 2020. It continued over several days but did not conclude until January 2021, even though the parties were the only witnesses to testify. Plaintiff was represented by counsel at trial; defendant was self-represented.

During plaintiff's testimony, she provided documentation for, and testified about, her TD Bank ITF account. She also testified regarding accrued points on various credit cards, identifying how many points were awarded premaritally, and the conditions attendant to using the points. Further, she testified about the RCUs she received from her then employer, Avis Budget Group (ABG), when

the RCUs vested, and the terms under which she was entitled to receive the RCUs in her position as real estate counsel staff attorney for ABG. Following plaintiff's testimony about her TD Bank ITF account, defendant conceded this account was exempt from equitable distribution.

Defendant's testimony centered around claims his Vanguard Roth and Vanguard Traditional IRAs were premarital and thus, exempt from equitable distribution. However, shortly before the trial concluded, defendant advised plaintiff and Judge DiBiasi that defendant "was mistaken and had misidentified his account numbers." Defendant explained "he confused [a] previously stipulated marital retirement account . . . with [his] Vanguard Roth IRA . . . . [and now] concede[d] that the Vanguard Roth IRA ending in 940 [wa]s . . . a marital account . . . subject to equitable distribution." This concession left Judge DiBiasi to determine whether defendant's "Vanguard Roth IRA ending in 322 and Vanguard Traditional IRA ending in 4939" were subject to equitable distribution.

On March 10, 2021, Judge DiBiasi placed his decision on the record regarding the parties' four trial issues. He prefaced his decision with the following remarks:

> This case has a long and tortured history.
> Litigation . . . lasted three years. The parties conducted

12

extensive discovery, engaged in . . . voluminous motion practice, attended approximately ten mediation sessions, participated in multiple and partially successful [ISCs], and ultimately tried several issues to conclusion. Civility does not exist between the parties. The record is replete with venom, insults[,] and contempt. Their anger permeated the courtroom[] and penetrated the [Z]oom screen. It was palpable and self-destructive. They have an unhealthy and toxic relationship. The fractured procedural history reflects this toxicity.

After recounting the litigation's procedural history and the parties' pretrial agreements, the judge stated that their agreements and a decision he rendered on "a midtrial motion" would be incorporated into the JOD, so the parties would "have one document to which [they could] refer" in the future. The judge also addressed defendant's claim that defendant's limited "ability to access certain discovery as a self-[]represented litigant prevented him from effectively representing himself." Judge DiBiasi emphasized he had discussed this very "argument on the record multiple times, but it b[ore] repeating." The judge then stated he was "confident . . . defendant had access to all the necessary information and documents he needed to adequately represent himself on the four limited trial issues."

Turning to his decision on the four trial issues, the judge found: (1) plaintiff proved her ITF checking account was premarital and thus, exempt from

equitable distribution; (2) plaintiff owed defendant $1,145.50, plus an additional $250 for his share of her marital credit card points and airline miles, respectively; (3) plaintiff owed defendant $1,666[3] for his one-half share of the marital portion of her 2017 RCUs; and (4) because defendant failed to show his retirement accounts ending in 332 and 4939 were not commingled during the marriage or were otherwise exempt, the marital portion of those accounts were to be equally divided between the parties.

The judge further observed defendant's testimony about his retirement accounts was "confusing and unpersuasive." Additionally, the judge stated he "was surprised that [defendant] didn't better understand his own account history" because "[t]hese were his accounts[ and defendant] was in the best position to explain the account history to the court." The judge entered a conforming JOD that day, and incorporated the parties' prior oral and written agreements into the judgment as he stated he would.

_____

[3] This amount was subsequently adjusted in the JOD and AJOD to reflect plaintiff owed defendant $2,111.76 for his share of this asset.

The parties subsequently moved for clarification or modification of the JOD. Judge DiBiasi granted in part, and denied, in part, their applications in an order dated June 11, 2021, and then entered the AJOD the same day.[4]

Three months later, each party moved for an award of counsel fees from the other party. Defendant sought fees totaling $174,689.68; plaintiff requested $480,000 in counsel fees. Following argument on October 29, 2021, during which both parties were represented by counsel, Judge DiBiasi orally granted plaintiff $25,000 in counsel fees, and declined to award defendant any counsel fees. In explaining his decision on the record, the judge stated:

> Now, this is a matter with a [PNA] that addressed alimony, a negotiated [fifty/fifty] parenting plan, no child support, and relatively straight[]forward equitable distribution [issues]. Nevertheless, closure required . . . ten mediation sessions, five [ISCs] with the court, [several] days of trial, and many, many formal applications. [Litigation] lasted over a thousand days. . . .
>
> The parties have incurred nearly [one] million [dollars] in legal fees—let me repeat, [one] million [dollars]. It's an incomprehensible amount of money. The parties are successful but they're not necessarily wealthy.

---

[4] Because the clarifications and modifications set forth in the AJOD do not affect our decision, we do not address them.

A-3143-20

. . . The court relentlessly tried to stop this madness. It failed. . . . Even [c]ounsel tried to stop t[he parties]. They also failed.

The parties' decisions have consequences. In this case, the consequences add up to hundreds and hundreds of thousands of dollars . . . . They must own that. No motion can repair what the parties have broken. This is quite simply the worst case with the worst behaved litigants over which I have presided in my nearly five years in the Family Division, and it was all completely avoidable.

Next, the judge acknowledged he was authorized to award counsel fees pursuant to Rules 4:42-9 and 5:3-5, and N.J.S.A. 2A:34-23. After finding the hourly rates of counsel were reasonable, the judge referenced the factors set forth under Rule 5:3-5(c), and stated:

[B]oth parties are earning approximately similar level[s] of incomes, although their income[s have] fluctuated recently. They each received about . . . $100,000 or so[] from the sale of the marital residence. They each have retirement accounts. Plaintiff is the beneficiary of [a] Trust. I'm not precisely sure the extent to which she receives distributions from that Trust[,] but the court is aware that there are distributions that exist and that does put her in a stronger financial position than [defendant].

. . . The parties are both successful professionals. They each have the ability to afford reasonable attorney fees in connection with common sense matrimonial litigation, but that's not what happened here. The parties spent an unhealthy amount of their income and assets on this litigation.

16

So, while each party is able to perhaps contribute to the other party's fees, neither party is in a position certainly to pay all of those fees. They're just too high. They're too high.

. . . .

Now, here, to be perfectly clear, <u>both parties contributed to this toxic litigation. Neither party has clean hands. I am confident of that finding. Their behavior more often than not was shocking and embarrassing</u>. . . . They were just as disrespectful in the courtroom as they were over Zoom. Grievances consume them.

. . . The court has never experienced anything quite like them. <u>The economic issues [we]re relatively straight forward but resentment and anger prevented the parties from quickly striking common-sense solutions</u>. . . .

The spirit and intent of the settlement conferences was to end the litigation [and] to obtain closure, but that never happened[,] and the court finds that the defendant is primarily responsible for this outcome. He tried to renegotiate the settlement. He made it impossible to finalize the [MSA]. Defendant tried to reneg[e] and presented a [fifteen]-page, single-spaced list of outstanding issues. <u>The court finds that to be in bad faith</u>.

Defendant then demanded trials on issues that he primarily lost on. <u>Plaintiff is not perfect. Both parties were disrespectful to the court, to counsel, and to each other but plaintiff is not primarily responsible for how the litigation ended</u>.

. . . .

17

. . . Here, plaintiff has indicated [she] . . . paid over $480,000 in counsel fees. Defendant . . . paid nearly $200,000 but has a substantial balance that he owes of another $200,000. That balance will linger with him for some time. It's a significant obligation that is outstanding.

With respect to the results obtained, plaintiff primarily succeeded on the issues that the parties decided to try to conclusion. And the degree to which [fees] were incurred to enforce existing orders or to compel discovery, <u>there was voluminous prejudgment motion practice in this case by both parties</u>.

So, . . . in light of the court's analysis of the factors set forth in . . . <u>Rule</u> 5:3-5[(c)], the court finds . . . defendant shall pay plaintiff counsel fees in the amount of $25,000 and shall pay those fees within [thirty] days.

[(Emphasis added).]

## II.

On appeal, defendant argues Judge DiBiasi erred in: (1) denying "defendant's application to retain counsel for the trial"; (2) failing to compel plaintiff "to serve a meaningful [CIS]"; (3) "limit[ing] the issues to be tried on the basis of a partial settlement which did not exist"; and (4) "awarding [plaintiff] counsel fees[,] given her lack of good faith throughout the proceedings." Additionally, defendant contends for the first time on appeal the

18

judge "demonstrated a general bias against [him] which resulted in an unjust judgment."

Plaintiff disagrees with defendant's contentions and argues he "is procedurally barred from appealing an[y] issue upon which he previously agreed . . . [because] he does not allege unconscionability, fraud, or overreaching." She also argues on cross-appeal that Judge DiBiasi "abused [his] discretion and failed to consider the extent of defendant's bad faith when [the judge] limited plaintiff's counsel fee award to only $25,000 out of the $480,000 she incurred."

The parties' arguments lack merit. R. 2:11-3(e)(1)(E). We add the following comments.

Our review of a Family Part order is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). Appellate courts "review [a] Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare, 154 N.J. at 412). Such deference is particularly proper "when the evidence is largely testimonial and involves questions of credibility." Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

"Thus, 'findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence.'" Thieme, 227 N.J. at 283 (quoting Cesare, 154 N.J. at 413). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should we interfere." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). However, we review legal issues de novo. Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017).

Appellate review is not limitless. "The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves." State v. Robinson, 200 N.J. 1, 19 (2009); see also Zaman v. Felton, 219 N.J. 199, 226-27 (2014). Accordingly, we need not consider arguments which were not raised in the trial court. Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Similarly, we do not consider arguments raised for the first time in reply briefs. Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001). Also, "claims not addressed in [a party's] merits brief [are] deemed abandoned." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2023) (citing Drinker Biddle & Reath LLP v. N.J. Dep't. of Law

& Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011)).  Moreover, to the extent we review an argument raised for the first time on appeal, we do so under a plain error standard, meaning we disregard such errors unless "clearly capable of producing an unjust result."  R. 2:10-2.

Regarding defendant's first argument—which is mistakenly framed as a denial of counsel issue rather than denial of his belated request for an adjournment days before the divorce trial was due to begin—it is well settled that a "trial court's decision to grant or deny an adjournment is reviewed under an abuse of discretion standard."  State ex rel. Comm'r of Transp. v. Shalom Money St., LLC, 432 N.J. Super. 1, 7 (App. Div. 2013).  Thus, we will not reverse the denial of an adjournment request to allow a party to retain counsel of their choosing "absent a showing of an abuse of discretion which caused [the party] a 'manifest wrong or injury.'"  State v. Hayes, 205 N.J. 522, 537 (2011) (quoting State v. McLaughlin, 310 N.J. Super. 242, 259 (App. Div. 1998)).  In deciding whether to grant a request for an adjournment to enable a party to retain successor counsel, "the trial court must strike a balance between its inherent and necessary right to control its own calendar and the public's interest in the orderly administration of justice, on the one hand," and a party's right to have sufficient

time to retain that party's choice of counsel. Id. at 538 (quoting State v. Furguson, 198 N.J. Super. 395, 402 (App. Div. 1985)).

Here, we are satisfied the judge did not abuse his discretion in denying defendant's June 25, 2020 adjournment request. As noted, defendant made this request days before the trial was to commence on July 6, 2020, despite the fact he had sufficient time to retain counsel after Judge DiBiasi granted his trial attorney's motion to withdraw from the case in May 2020. Moreover, defendant fails to explain why he could not have retained counsel between May 2020 and September 8, 2020, the date the trial began.

Turning to defendant's second argument, we generally "accord substantial deference to a trial court's disposition of a discovery dispute" and "will not ordinarily reverse" those decisions "absent an abuse of discretion or a judge's misunderstanding or misapplication of the law." Brugaletta v. Garcia, 234 N.J. 225, 240 (2018) (quoting Cap. Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79-80, 165 (2017)). Although our discovery rules are "construed liberally in favor of broad pretrial discovery," Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997), a party's right to discovery is "not unlimited," Trenton Renewable Power, LLC v. Denali Water Sols., LLC, 470 N.J. Super.

22

218, 226 (App. Div. 2022) (quoting Piniero v. N.J. Div. of State Police, 404 N.J. Super. 194, 204 (App. Div. 2008)).

Further, pertinent to defendant's discovery argument, Rule 5:5-2(a) provides, in part, "[t]he case information statement required by this rule shall be filed and served in all contested family actions . . . in which there is any issue as to custody, support, alimony[,] or equitable distribution." Additionally, pursuant to Rule 5:5-2(c), parties maintain a continuing obligation to inform the court of any "material changes in the information supplied on the [CIS]," and "[a]ll amendments to the [CIS] shall be filed with the court no later than [twenty] days before the final hearing."

Here, neither party timely filed an amended CIS before the scheduled trial date of July 6, 2020. Also, both parties were ordered during the pendency of this matter to cure "discovery deficiencies." However, because the parties exchanged voluminous discovery prior to trial and resolved numerous issues pendente lite, leaving Judge DiBiasi to rule on only four discrete issues, we decline to find the judge erred in failing to order plaintiff to update her July 5, 2020 CIS.

Regarding defendant's contention that Judge DiBiasi erred in "limit[ing] the issues to be tried," we are mindful New Jersey has a "strong public policy in

favor of the settlement of litigation." Gere v. Louis, 209 N.J. 486, 500 (2012) (citing Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008)). "This policy rests on the recognition that 'parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.'" Ibid. (quoting Impink ex rel. Baldi v. Reynes, 396 N.J. Super. 553, 563 (App. Div. 2007)).

"In furtherance of this policy, our courts 'strain to give effect to the terms of a settlement wherever possible.'" Brundage, 195 N.J. at 601 (quoting Dep't of Pub. Advoc. v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985)). "In general, settlement agreements will be honored 'absent a demonstration of fraud or other compelling circumstances.'" Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 125 (App. Div. 1983) (internal quotation marks omitted)).

We also recognize "[a] Family Part judge has broad discretion in . . . allocating assets subject to equitable distribution," Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012), and in determining the manner of distribution, Steneken v. Steneken, 367 N.J. Super. 427, 435 (App. Div. 2004), aff'd in part, modified in part on other grounds, 183 N.J. 290 (2005). An appellate court will affirm an award of equitable distribution provided "the trial court could

24                                                                              A-3143-20

reasonably have reached its result from the evidence presented, and the award is not distorted by legal or factual mistake." La Sala v. La Sala, 335 N.J. Super. 1, 6 (App. Div. 2000).

We also note that typically, "[a]ny property owned by a husband or wife at the time of marriage will remain the separate property of such spouse and in the event of divorce will be considered an immune asset and not eligible for distribution." Valentino v. Valentino, 309 N.J. Super. 334, 338 (App. Div. 1998) (citation omitted). The burden of establishing that an asset or any portion thereof is immune from distribution rests on the party claiming its immunity. Pacifico v. Pacifico, 190 N.J. 258, 269 (2007).

Here, the record well supports Judge DiBiasi's determination that the parties reached numerous agreements prior to trial, including agreements reached during lengthy ISCs, with the benefit of counsel and the judge's assistance. The record also supports the judge's findings that plaintiff met her burden in demonstrating certain property was immune from equitable distribution, whereas defendant failed to satisfy his burden in that regard. Accordingly, defendant's arguments that the judge erred in concluding the parties left only four discrete issues for trial, and that the judge abused his discretion in deciding those four issues, fail.

A-3143-20

Turning to defendant's newly raised bias argument, we recognize "judges must refrain . . . from sitting in any causes where their objectivity and impartiality may fairly be brought into question." State v. Deutsch, 34 N.J. 190, 206 (1961). "Any questions concerning that impartiality threatens the integrity of our judicial process." State v. Tucker, 264 N.J. Super. 549, 554 (App. Div. 1993).

Concerns pertaining to a judge's partiality are generally considered in the context of whether the judge should be recused from the case. But the decision about whether recusal is warranted is a matter within the sound discretion of the judge. State v. McCabe, 201 N.J. 34, 45 (2010); State v. Medina, 349 N.J. Super. 108, 129 (App. Div. 2002). Importantly, a judge cannot be considered partial or biased merely because of rulings that are unfavorable toward the party seeking recusal. State v. Marshall, 148 N.J. 89, 186-87 (1997).

Where a litigant fails to file a motion for recusal in the trial court, we assess the issue under the plain error standard. Medina, 349 N.J. Super. at 129 (citing Magill v. Casel, 238 N.J. Super. 57, 63 (App. Div. 1990)). As discussed, under this standard, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Here, because defendant's claims of bias

26

are not supported by the record, Judge DiBiasi committed no error, let alone plain error, in failing to recuse himself in this matter.

Finally, regarding the parties' counsel fee arguments, we observe that an "award of counsel fees and costs in a matrimonial action, rests in the [sound] discretion of the trial court." Guglielmo v. Guglielmo, 253 N.J. Super. 531, 544-45 (App. Div. 1992) (citing Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990)). Therefore, we will not disturb a counsel fee decision in a matrimonial matter "absent a showing of an abuse of discretion involving a clear error in judgment." Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010).

"An allowance for counsel fees is permitted to any party in a divorce action, R[ule] 5:3-5(c), subject to the provisions of Rule 4:42-9." Slutsky v. Slutsky, 451 N.J. Super. 332, 366 (App. Div. 2017). Additionally, "where a party acts in bad faith[,] the purpose of the counsel fee award is to protect the innocent party from [the] unnecessary costs and to punish the guilty party." Welch v. Welch, 401 N.J. Super. 438, 448 (Ch. Div. 2008) (citing Yueh v. Yueh, 329 N.J. Super. 447, 461 (App. Div. 2000)).

Per Rule 5:3-5(c), family courts must consider the following nine factors when deciding attorney fee applications:

> (1)    the financial circumstances of the parties;

(2)     the ability of the parties to pay their own fees or to contribute to the fees of the other party;

(3)     the reasonableness and good faith of the positions advanced by the parties both during and prior to trial;

(4)     the extent of the fees incurred by both parties;

(5)     any fees previously awarded;

(6)     the amount of fees previously paid to counsel by each party;

(7)     the results obtained;

(8)     the degree to which fees were incurred to enforce existing orders or to compel discovery; and

(9)     any other factor bearing on the fairness of an award.

In Mani v. Mani, 183 N.J. 70, 94-95 (2005), the Supreme Court summarized the attorney fee inquiry as follows:

> In a nutshell, in awarding counsel fees, the court must consider whether the party requesting the fees is in financial need; whether the party against whom the fees are sought has the ability to pay; the good or bad faith of either party in pursuing or defending the action; the nature and extent of the services rendered; and the reasonableness of the fees.
>
> [Ibid. (citing Williams v. Williams, 59 N.J. 229, 233 (1971)).]

A-3143-20

"In fashioning an attorney fee award, the judge must determine the 'lodestar,' which equals the number of hours reasonably expended multiplied by a reasonable hourly rate." J.E.V. v. K.V., 426 N.J. Super. 475, 493 (App. Div. 2012) (quoting Yueh, 329 N.J. Super. at 464). The court must exclude any hours billed that are "not reasonably expended" and calculate the reasonable hourly rate as per community standards. Yueh, 329 N.J. Super. at 465 (quoting Rendine v. Pantzer, 141 N.J. 292, 335 (1995)).

Governed by these standards, we discern no reason to disturb the challenged judgments, nor the October 29, 2021 order granting plaintiff a $25,000 counsel fee award. In reaching this conclusion, we do not condone plaintiff's inexplicable omissions, nor her use of "TBD" in multiple places in her July 5, 2020 CIS, rather than monetary figures, including her use of "TBD" for her personal and total monthly budget. Similarly, we do not sanction her attorney's pre-trial proposal that because the parties exchanged discovery, if defendant wanted to know the balances of plaintiff's accounts, "he certainly c[ould] go look them up himself." Still, considering the parties exchanged significant discovery prior to trial and resolved all but four equitable distribution issues, we agree with Judge DiBiasi that "defendant had access to all the

29                                                                        A-3143-20

necessary information and documents he needed to adequately represent himself on the four limited trial issues."

Likewise, the record well supports the judge's findings that: (1) defendant acted in bad faith and "made it impossible to finalize the [MSA]"; (2) both parties "contributed to this toxic litigation"; (3) "neither party ha[d] clean hands"; and (4) "[t]he economic issues" in this matter were "relatively straight forward but resentment and anger prevented the parties from quickly striking common-sense solutions." Accordingly, we affirm the JOD, AJOD, and October 29, 2021 order substantially for the reasons set forth in Judge DiBiasi's thoughtful and comprehensive oral opinions.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION